UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LABIB JANBAY, Individually and on Behalf
of All Others Similarly Situated,

Plaintiff,

v.

CANADIAN SOLAR, INC., SHAWN QU and
ARTHUR CHIEN,

Defendants.

No. 10-cv-4430 (RWS)

CONSOLIDATED COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

**JURY TRIAL DEMANDED**

Plaintiffs, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes without limitation:  1) review and analysis of regulatory filings made by Canadian Solar, Inc. ("Canadian Solar" or the "Company"); 2) review and analysis of press releases from the Company; 3) review of media reports issued by and disseminated by the Company; 4) review of other publicly available information, including litigation involving Defendants; 5) interviews of witnesses with direct knowledge; and 5) review of analyst reports regarding Canadian Solar, Inc.

## I.    NATURE OF THE ACTION

1.    This is a class action brought by the Plaintiffs on behalf of all persons or entities who purchased shares of Canadian Solar during the period from May 26, 2009, to June 1, 2010, inclusive (the "Class Period") and who were damaged thereby.  The action pursues remedies for purchasers of Canadian Solar under the Securities Exchange Act of 1934 (the "1934 Act").

2.    Canadian Solar was founded in the Province of Ontario, Canada in October 2001 and was listed on the NASDAQ Exchange in 2006 under ticker symbol CSIQ.  Canadian Solar currently operates on three continents, delivering solar modules to customers in (24) countries.

3.    Canadian Solar is one of the world's largest solar module producers.  Canadian Solar is a vertically-integrated manufacturer of silicon, ingots, wafers, cells, solar modules (panels) and custom-designed solar power applications.

4.    On May 26, 2009, the Class Period commences with Canadian Solar reporting better than expected financial results, which the Company and its CEO were quick to attribute to "prudent financial management," while assuring investors that the Company exercised a "conservative shipment strategy."  This good news caused Canadian Solar shares to jump more than 10% to $11.03 per share.  In reality, however, the stronger than expected financial results had more to do with improper accounting shenanigans and manipulations than "prudent financial management."

5.     On August 6, 2009, Canadian Solar reported more excellent financial results for the quarter ended June 30, 2009.  These reported financial results drove Canadian Solar's share price up to close at $18.95 per share (a gain of $2.83 or 17.6%) on very heavy trading for the day.

6.     On November 17, 2009, the Company again reported excellent financial results, causing its shares to rise another 2.1% for the day to close at $20.11 per share.  These excellent reported financial results included many millions of dollars of revenues from an illicit accounting scheme whereby the Company parked inventory at a third party's warehouse and pretended that it had been "sold" to the third party.

7.     On February 19, 2010, Canadian Solar issued a press release over the PR NEWSWIRE pre-announcing that profit margins would be significantly lower than previously projected, sending its shares down from the prior day's close of $24.74 per share to a closing price on February 19, 2010, of $20.85 per share – a loss of $3.89 per share or 15.7%.

8.     On March 3, 2010, the Company announced its financial results for the fourth quarter and year ended December 31, 2009.  Canadian Solar reported revenues of $287 million for the quarter and net income of $14.9 million.  These excellent reported financial results were wildly misstated, as the Company would be forced to admit several months later.

9.     On April 20, 2010, at approximately 4:00 p.m., Canadian Solar announced that Q1 2010 margins would be lower than previously forecast.  In response to this bad news about lower than expected profit margins, Canadian Solar shares opened trading significantly lower on the morning of April 21, 2010, and closed trading for the day at $18.26 per share, a decline of $3.07 (14.4%) for the day.

10.     On June 1, 2010, the Class Period ends when Canadian Solar revealed to the public that it would not be able to file on a timely basis its financial results for the first quarter of 2010.  The Company announced that the Audit Committee of its Board of Directors had opened an investigation and that the Company has received a subpoena from the United States Securities and Exchange Commission ("SEC") relating to, among other things, certain sales transactions in

2009.  According to Canadian Solar, the Audit Committee had retained outside counsel and an independent forensic accounting firm to assist the Company in reviewing the transactions described in the subpoena.  The Company also revealed that it may revise its financial results for the fourth fiscal quarter of 2009 ending December 31, 2009.  On this news, shares of Canadian Solar dropped in value by 14.25% or $1.69 per share to close on June 2, 1010, at $10.17 on unusually heavy volume.  This was one of several occasions, both during and after the Class Period, when Canadian Solar stock declined materially on disclosure of previously misrepresented or undisclosed information.

11.    Plaintiffs allege that during the Class Period, Defendants made false and/or misleading statements, and failed to disclose material adverse information about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  1) with respect to sales to certain customers, it was uncertain whether the Company would receive full cash payments; 2) certain goods were subsequently returned after the end of the quarter; 3) certain goods failed to satisfy quality control standards and therefore were not certified for sale; 4) as a result, the Company's financial results were overstated during the Class Period; 5) the Company lacked adequate internal controls and financial controls; and 6) as a result, the Company's public statements and filings related to financial results were false and misleading at all relevant times.

12.    Canadian Solar's wrongful conduct and omissions, and the resulting dramatic decline in the Company's market value, caused significant losses to Plaintiffs and the other class members who were all damaged thereby.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.     PARTIES

17.     Lead Plaintiffs Michael Goldstein, Ali Alemi, John Szczypinski, Bansidhar Datta, Rojwol Shrestha, Eric Spiegel and James Cole purchased shares of Canadian Solar during the Class Period at artificially inflated prices due to the misconduct of the Defendants, as described herein.

18.     Co-lead Plaintiff Harry Tabak purchased shares of Canadian Solar during the Class Period at artificially inflated prices due to the misconduct of the Defendants, as described herein.

19.     Defendant Canadian Solar, Inc. is a Canadian Corporation with its principal executive offices located at No. 199 Lushan Road, Suzhou New District, Suzhou, Jiangsu, People's Republic of China.  The Company was founded in Ontario, Canada in 2001 and listed on the NASDAQ exchange in 2006.  Canadian Solar's U.S. headquarters are located at 12657 Alcosta Blvd., Suite 140, San Ramon, California  94583.

20.     Defendant Shawn (Xiaohua) Qu ("Qu") was at all relevant times Chief Executive Officer ("CEO"), President and Chairman of the board of directors of the Company.

21.     Defendant Arthur Chien ("Chien") was at all relevant times Chief Financial Officer ("CFO") and a member of the board of directors of the Company.

- 4 -

22.     Defendants Qu and Chien are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Canadian Solar's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all person or entities who purchased shares of the Company from May 26, 2010, through June 1, 2010 (the "Class Period") and who were damaged thereby.

24.     Excluded from the Class are Defendants, the officers and directors of Canadian Solar, members of the Individual Defendants' immediate families, the Individual Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or have had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  The Company's shares were actively traded in an efficient market.  While the exact number of class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from

records maintained by Canadian Solar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Company has tens of millions of outstanding shares.

26.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by Defendants' acts as alleged herein;

(b)     whether statements made by the Defendants during the Class Period misrepresented or failed to include necessary information about the business, operations, and prospects of Canadian Solar; and

(c)     the extent of damages suffered by members of the Class.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     SUBSTANTIVE ALLEGATIONS

## A.     Canadian Solar's False and Misleading Q1 2009 Reported Financial Results

29.     On May 26, 2009, the Class Period commences when Canadian Solar announced its financial results for the first quarter of 2009, which ended on March 31, 2009, in a press release entitled "Canadian Solar Reports First Quarter 2009 Results" over the PR NEWSWIRE:

- 6 -

TORONTO, May 26 /PRNewswire-Asia/ -- Canadian Solar Inc. ("the Company", "Canadian Solar" or "we") (Nasdaq: CSIQ ) today announced its unaudited financial results for the first quarter of 2009 ended March 31, 2009 and updated outlook for full year 2009 shipments.

First Quarter 2009 Results

- Net revenues for the quarter were $49.5 million, compared to net revenues of $171.2 million for the first quarter of 2008 and $68.8 million for the fourth quarter of 2008.

- Shipments for the quarter were approximately 18 MW, including 1.2 MW of solar grade e-Modules and 1.6 MW of solar cells and specialty solar application products.

- Net loss for the quarter on a GAAP basis was $4.8 million, or $0.13 per diluted share, compared to net income of $18.6 million, or $0.57 per diluted share, for the first quarter of 2008 and net loss of $49.2 million, or $1.38 per diluted share, for the fourth quarter of 2008.

This disclosure was materially false and misleading when made in that the reported financial results were materially misstated and not prepared in compliance with GAAP, as detailed below.

30.    On the May 26, 2009 conference call related to this Q1 2009 earnings release, the Defendants continued to misrepresent the Company's results, with Defendant Qu self-servingly attributing Canadian Solar's strong reported operating results to "prudent management" rather than the financial manipulations that were more directly related to these results:

SHAWN QU, CHAIRMAN & CEO, CANADIAN SOLAR INC.: Thanks, Alex and thank you everyone for joining us for today's first quarter 2009 earnings call. **Our Q1 results were in line with our plan, as we continue to exercise prudent financial management strategies** in order to respond to the global economic downturn and resulting pressures found our levels of solar industry value chain.  Importantly, Canadian Solar ended the quarter with a strong and liquid balance sheet to provide our customers, bankers, and investors with confidence on our ability to honor our long term commitment to our product.

In terms of actual results, **net revenue for Q1 was $49.5 million** compared to net revenue of $171.2 million for Q1 2008 and $68.8 million for Q4 2008.

\*     \*     \*

- 7 -

> **We exercised a conservative shipment strategy in order to minimize any potential channel inventory build off, while also reducing payment risk.** [Emphasis added.]

These statements were materially false and misleading when made in that the operating results were more correctly attributable to accounting manipulations than "prudent management." Further, as described below, Canadian Solar's shipment strategy was anything but "conservative" and rather than minimizing channel inventory, in fact knowingly increased channel inventory by shipping millions of dollars of product to distributors under an undisclosed consignment arrangement.

31. As reported by BLOOMBERG NEWS, although the reported results were a loss of $0.13 per share, that loss compared very favorably with analyst estimates that had projected the Company to lose $0.24 per share. This good news caused Canadian Solar's shares to jump 10.2% from a pre-Class Period close of $10.01 per share on May 22, 2009, to close at $11.03 on May 26, 2009.

32. On May 27, 2009, Canadian Solar filed with the SEC a Form 6-K, signed by Defendant Qu, attaching the May 26, 2009 press release as an exhibit. This Form 6-K was materially false and misleading when issued for the same reasons as the May 26, 2010 press release, as described above. These surprisingly good reported financial results caused the Company's shares to rise another 9.5% on May 27, 2009, to close at $12.08 per share.

**B.     Canadian Solar's False and Misleading Representations Regarding its Systems of Internal Controls**

33. On June 8, 2009, Canadian Solar filed its annual report for the year ended December 31, 2008, with the SEC on Form 20-F.

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended, for our company. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements in accordance with generally accepted accounting principles and includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of a company's assets, (2) provide

- 8 -

reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with generally accepted accounting principles, and that a company's receipts and expenditures are being made only in accordance with authorizations of a company's management and directors, and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of a company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable assurance with respect to consolidated financial statement preparation and presentation and may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

As required by Section 404 of the Sarbanes-Oxley Act of 2002 and related rules as promulgated by the Securities and Exchange Commission, management assessed the effectiveness of our internal control over financial reporting as of December 31, 2008 using criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

**Based on this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2008 based on the criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.**

The effectiveness of internal control over financial reporting as of December 31, 2008 has been audited by Deloitte Touche Tohmatsu CPA Ltd., an independent registered public accounting firm, who has also audited our consolidated financial statements for the year ended December 31, 2008.  [Emphasis added.]

34.     Defendants Qu and Chien also signed sworn certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which were attached as Exhibits 12.1 and 12.2 respectively to this Form 20-F, attesting to the disclosure procedures and controls employed by Canadian Solar:

4. The Company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

- 9 -

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of Company's board of directors (or persons performing the equivalent function):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

35.     Also in the Form 20-F was the attestation report of Canadian Solar's independent auditor, Deloitte Touche Tohmatsu:

Attestation Report of the Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Canadian Solar Inc.:

**We have audited the internal control over financial reporting of Canadian Solar Inc**. and subsidiaries (the "Company") as of

December 31, 2008, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

 We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*       *       *

**In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.**

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2008 of the Company and our report dated June 5, 2009 expressed an unqualified opinion on those financial statements and financial statement schedule and included an explanatory paragraphs regarding the Company's adoption of a new accounting standard.

/s/  Deloitte Touche Tohmatsu CPA Ltd.

Shanghai, China

June 5, 2009  [Emphasis added.]

36.    These disclosures were materially false and misleading when made in that Canadian Solar's system of accounting internal controls was materially flawed, as it would be forced to disclose on August 19, 2010, as detailed below, when it restated its previously issued

- 11 -

financial reports and eliminated huge amounts of previously reported revenues, as well as added more than $16 million in "General and Administrative Expense."  These disclosures served to assure investors that Canadian Solar's financial reporting would be accurate, including that no massive "bill and hold" scheme or other scheme to overstate revenues and/or understate expenses would go unnoticed by management.

**C.     Canadian Solar's False and Misleading Registration Statement**

37.     On July 7, 2009, Canadian Solar filed a registration statement on Form F-3 with the Securities and Exchange Commission (the "Registration Statement").  The Registration Statement was signed by Defendants Qu and Chien and incorporated by reference the Company's annual report on Form 20-F for the fiscal year ended December 31, 2008, as filed with the SEC on June 8, 2009.  According to the Registration Statement, "Our annual report on Form 20-F for the fiscal year ended December 31, 2008 contains a description of our business and audited consolidated financial statements with a report by our independent auditors. These financial statements are prepared in accordance with accounting principles generally accepted in the United States."

**D.     Canadian Solar's False and Misleading Q2 2009 Reported Financial Results**

38.     On August 6, 2009, Canadian Solar reported its financial results for the second quarter of 2009 (which ended on June 30, 2009) in a press release entitled "Canadian Solar Reports Second Quarter 2009 Results":

> Ontario, Canada, August 6, 2009 — Canadian Solar Inc. ("the Company", "Canadian Solar" or "we") (NASDAQ: CSIQ) today announced its unaudited financial results for the second quarter of 2009 ended June 30, 2009 and its outlook for third quarter 2009 shipments.
>
> Net revenues for the quarter were $114.2 million, compared to net revenues of $212.6 million for the second quarter of 2008 and $49.5 million for the first quarter of 2009.
>
> Net income for the quarter was $17.7 million, or $0.49 per diluted share, compared to $12.1 million, or $0.41 per diluted share, for the second quarter of 2008 and a net loss of $ 4.8 million, or $0.13 per diluted share, for the first quarter of 2009.

- 12 -

Our Q209 shipments were 48.2 MW, including 39.5 MW of conventional high efficiency polysilicon modules, 7.0 MW of our proprietary e-Modules, and 1.7 MW of cells and solar application products.

*   *   *

Dr. Shawn Qu, Chairman and CEO of Canadian Solar, commented: "Our second quarter revenue came in well ahead of expectations as we benefitted from robust customer orders around the world. **We are glad that we took a conservative financial management strategy in Q4 of 2008 and Q1 this year, including prudent inventory measures and cash management, which allowed us to compete in Q2 with low materials and financing costs.** These advantages, combined with our competitive processing costs and lean operating structure, resulted in a significant improvement in our gross margin and net margin, and position us for success in future quarters. We have noticed that many customers and their financing banks choose Canadian Solar products due to our competitive prices, product quality and strength of our balance sheet. **Our flexible vertical integration business model, reputation for high-quality and our solid customer relationships allow us not only to compete, but also to gain market share in a tough economic environment**."

Arthur Chien, CFO of Canadian Solar, noted: "**We significantly reduced our higher priced inventory in Q2,** and are now very well positioned to benefit from further declines in raw materials costs as we work to increase our market share. Our current inventory primarily consists of feedstock, wafer and cells we will use for Q3 shipments." [Emphasis added.]

This press release was materially false and misleading when made because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: 1) that material amounts of these reported revenues were based upon contingent sales, including alleged sales resulting from large volumes of product shipped beginning in early 2009 that had not been ordered, and/or sales that were made to companies without approved credit; 2) that the Company's internal and disclosure controls with respect to its revenue recognition policy were materially deficient; 3) as a result of the forgoing, Canadian Solar's financial statements failed to fairly represent conformity with GAAP and were materially false and misleading; and 4) based on the foregoing, Defendants lacked a basis to make positive statements about the Company, its prospects and growth.

- 13 -

39.     These excellent reported financial results drove Canadian Solar's share price up to close at $18.95 per share on extremely heavy volume, a gain of $2.83 per share (17.6%) from the previous day's close of $16.12 per share.

40.     On August 7, 2009, Canadian Solar filed with the SEC a Form 6-K, signed by Defendant Qu, attaching the August 6, 2009 press release as an exhibit.  This Form 6-K was materially false and misleading when issued for the same reasons as the August 6, 2009 press release, as described above.

41.     On October 13, 2009, Canadian Solar announced over the PR NEWSWIRE that, based on its selected unaudited financial results, it expected to exceed prior guidance for the third quarter of 2009 and that it would raise its guidance for the full year 2009.  Defendant Qu was quoted as saying:

> Demand has continued to be strong among our core customer group as well as among new customers.  We anticipate that Q4 2009 will be even stronger than Q3 2009 in terms of shipments and we expect to maintain similar gross margins.  We plan to increase our solar module manufacturing capacity to 1 GW, our solar cell capacity to 700 MW and our ingot and wafer capacity to 350 MW by the end of 2010 to meet demand levels.

This statement was materially false and misleading because the "strong" demand for Canadian Solar products was largely a fabrication of revenue numbers using third parties, such as the distributor SunValley Solar, Inc. ("SunValley"), to pose as an actual purchaser of Canadian Solar products that were in fact not sold but consigned.  This led the Company to improperly recognize significant amounts of revenue and profits.

42.     Canadian Solar issued a press release that day announcing a follow-on offering of 6 million shares of common stock pursuant to an effective registration statement under the Securities Act of 1933.

43.     The next day, October 14, 2009, Defendant Qu signed and the Company filed a Form 6-K with the SEC.  The Form 6-K contained the unaudited condensed consolidated financial statements for the six months ended June 30, 2009, as reported above.  In its Form 6-K, Defendants represented the following regarding the Company's revenues:

- 14 -

> We record sales of modules and silicon material when products are delivered and title has passed to the customers.  We only recognize revenues when prices to the seller are fixed or determinable, and collectability is reasonably assured.  Revenues also include reimbursements of shipping and handling costs of products sold to customers.  Sales agreements typically contain customary product warranties but do not contain any post-shipment obligations nor any return or credit provisions.

The statement was materially false and misleading when made because the Defendants were aware at the time of the statement that material quantities of revenues were being recognized prior to the delivery and passage of title to customers, and that Canadian Solar had significant post-shipment obligations to bring about the re-sale of product to end users.  Further, Defendants granted liberal rights of return for the products that customers and distributors, including SunValley, had "purchased."

E.  **Canadian Solar's False and Misleading Prospectus**

44.  On October 15, 2009, Canadian Solar filed a prospectus on Form 424B5 with the SEC.  This prospectus incorporated by reference the June 8, 2009 Form 20-F, as described above, and was materially false and misleading for the same reasons as the June 8, 2009 Form 20-F.  The prospectus was further materially false and misleading because it included "selected estimated unaudited results for the three months ended September 30, 2009."  These revenue figures were materially overstated in the manner described below.

45.  On October 22, 2009, the Company announced the completion of its follow-on public offering of an additional 6,000,000 shares of common stock.  In total, the Company sold 6.9 million shares of common stock at a public offering price of $15.75 per share, including 900,000 shares purchased by the underwriters in connection with their exercise, in full, of their options to purchase additional shares in connection with the offering.  The Company received total net proceeds of approximately $103.3 million from this follow-on offering.

**F.     Canadian Solar's False and Misleading Q3 2009 Financial Results**

46.     On November 17, 2009, Canadian Solar issued a press release over the PR

NEWSWIRE entitled "Canadian Solar Reports Third Quarter 2009 Results and Issues 2010

Guidance" announcing its financial results for the third quarter ended September 30, 2009:

> Ontario, Canada, November 17, 2009 — Canadian Solar Inc. (the "Company", "Canadian Solar" or "we") (NASDAQ: CSIQ) today announced its unaudited financial results for the third quarter of 2009 ended September 30, 2009 and its outlook for the fourth quarter of 2009 and the full year 2010.
>
> Net revenues for the third quarter of 2009 were $213.1 million, compared to net revenues of $114.2 million for the second quarter of 2009 and $252.4 million for the third quarter of 2008.
>
> Net income for the third quarter of 2009 was $25.3 million, or $0.69 per diluted share, compared to $17.7 million, or $0.49 per diluted share, for the second quarter of 2009 and $11.1 million, or $0.31 per diluted share, for the third quarter of 2008.
>
> Shipments for the third quarter of 2009 were 102.6 MW, compared to shipments of 48.2 MW for the second quarter of 2009 and 60 MW for the third quarter of 2008.  Third quarter 2009 sales came from all geographic markets important to the solar industry, with Europe continuing to be the Company's largest contributing geographic market.  Sales in that region grew strongly in the quarter, increasing 179% from the second quarter of 2009.
>
> Dr. Shawn Qu, Chairman and CEO of Canadian Solar, commented:  "We broke our previous records on both MW shipment volumes and net profit in this quarter.  The significant increases in sales and earnings were the result of the successful implementation of our global sales strategy combined with our strong brand name recognition, cost control and effective supply chain management.  Our flexible vertical integration model allowed us to capture the sharp increase in market demand during the quarter and to raise our module sales faster than the growth of our internal cell capacity.  Our R&D capability is another important competitive differentiator for Canadian Solar. During the quarter, three of our solar module products recorded the highest scores for P-type solar modules during the PV USA (PTC) tests, which are mandatory for the California Solar Initiatives. Subsequent to the quarter end, we pre-launched our high-output premium products using our enhanced selective emitter technology.  These products are expected to have monocrystalline cell conversion efficiencies of 18.5% and multicrystalline cell efficiencies of 17%.  We are also in the process of testing a cost effective two-axis tracker."
>
> Arthur Chien, CFO of Canadian Solar, noted:  "We are pleased that we were able to aggressively grow our top line while

delivering an 11.9% net margin.  We remain focused on managing all operating and financing costs as we work to improve profitability.  We expect the expansion of our internal cell facility in H1 2010 will help us to further offset ongoing industry pricing pressure, while at the same time increasing our manufacturing process control.  Importantly, our disciplined management of our balance sheet continues to give us superior operating leverage and a low cost of financing.  The recent successful closure of our follow-on stock offering in October further strengthened our balance sheet and prepares us for the Company's expected growth in 2010."

In response, Canadian Solar shares jumped 2.1% to close at $20.11 per share.  This disclosure was materially false and/or misleading when made because the Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:  1) that material amounts of these reported revenues were based upon contingent sales and/or sales that were made to companies without approved credit, including $5,764,430 in reported "sales" made to SunValley, as described below; 2) that the Company's internal and disclosure controls with respect to its revenue recognition policy were materially deficient; 3) as a result of the foregoing, Canadian Solar's financial statements failed to fairly represent conformity with GAAP and were materially false and misleading; and 4) based on the foregoing, Defendants lacked a basis to make positive statements about the Company, its prospects and growth.

47.     The next day, November 18, 2009, the Company filed a Form 6-K with the SEC attaching the November 17, 2009 press release.  This Form 6-K was materially false and misleading when issued for the same reasons as the November 17, 2009 press release, as described above.

48.     On February 19, 2010, Canadian Solar issued a press release over the PR NEWSWIRE pre-announcing that profit margins would be significantly lower than previously projected:

The Company now expects its gross margin to be in the mid-teens compared to prior expectations for the high-teens on a percentage basis.

- 17 -

This bad news sent the Company's shares down from the prior day's close of $24.74 per share to a closing price on February 19, 2010, of $20.85 per share – a loss of $3.89 per share or 15.7%. Although the Company blamed defective production equipment for this problem, along with the "clearing" of certain aged solar inventory, the reality is that gross margins had shrunk because Canadian Solar had "borrowed" large amounts of sales from Q4 2009 and Q1 2010 by prematurely recognizing such sales in Q3, as described, for example, in the SunValley transaction. In that transaction, revenues that properly belonged in the fourth quarter were improperly recognized in the third quarter, leading to the shrinking of Q4 2009 and Q1 2010 margins.

**G.     Canadian Solar's False and Misleading Q4 2009 Financial Results**

49.     On March 3, 2010, the Company announced its financial results for the fourth quarter and year ending December 31, 2009, in a press release entitled "Canadian Solar Reports Fourth Quarter and Full Year 2009 Results":

> For the fourth quarter of 2009, net revenues were $287.0 million, compared to net revenues of $68.8 for the fourth quarter of 2008 and $213.1 million for the third quarter of 2009. Net income for the fourth quarter was $14.9 million, or $0.35 per diluted share, compared to a net loss of $49.2 million, or $1.38 per diluted share, for the fourth quarter of 2008.
>
> 4Q09 shipment is 155.5 MW including 146.5 MW of module sales, approximately 6.5 MW of off-spec solar cells, and 2.5 MW of modules shipped to a solar power plant project, which the Company built and sold during the quarter. The net proceeds of these project sales are classified as investment income in the profit and loss statement.
>
> For the full year 2009, net revenues were $663.8 million, compared to $705.0 million for full year 2008. Net income for the full year 2009 was $53.1 million, or $1.41 per diluted share, compared to a net loss for the full year 2008 of $7.5 million, or $0.24 per diluted share.
>
> Dr. Shawn Qu, Chairman and CEO, commented: "In 2009 we rebounded from net revenues of $49.5 million in the first quarter to over $287.0 million in the fourth quarter; a record for both our quarterly revenue and shipments. The rapid quarterly shipment and revenue increase we achieved is due to our world-wide market share growth and improving cost structure. We delivered products to more than 300 customers in seven core country markets and 18 secondary markets. In 2010 we expect shipments growth in ten

- 18 -

core countries: Germany, Italy, Spain, the Czech Republic, France, the U.S., Canada, Japan, Korea and China. We are excited about our growth potential in these markets with the increasing brand recognition."

Arthur Chien, CFO of CSI, noted: "Gross profit increased significantly to more than $40 million in 4Q09, compared to a loss of nearly $30 million in 4Q08. We achieved this increase by investing in our business to support revenue growth opportunities. Accordingly there were increased sales, general and administrative expenses during the quarter, both to support increased year end shipments and to prepare ourselves for ongoing growth in sales in 2010.  4Q09 results also reflect the impact of a $5.1 million foreign exchange loss.  Overall, we achieved an increase in net income for 2009 of $53.1 million compared to a loss in 2008 of $7.5 million. Both inventory days and accounts receivable days declined quarter over quarter, while our cash position, leverage ratios and balance sheet improved considerably year over year.  We expect these improvements to continue into 2010."

50.     This disclosure was materially false and/or misleading when made because the Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:  1) the Company's financial results were overstated as the Company had recorded revenue from sales for which it had not been paid; 2) that certain goods had been returned after the end of the fourth quarter of 2009; 3) that the Company's internal and disclosure controls with respect to its revenue recognition policy were materially deficient; 4) as a result of the forgoing, Canadian Solar's financial statements failed to fairly represent conformity with GAAP and were materially false and misleading; and 5) based on the foregoing, Defendants lacked a basis to make positive statements about the Company, its prospects and growth.

51.     On March 5, 2010, Canadian Solar filed with the SEC a Form 6-K, signed by Defendant Qu, attaching the May 3, 2010 press release as an exhibit.  This Form 6-K was materially false and misleading when issued for the same reasons as the May 3, 2010 press release, as described above.

52.     On April 20, 2010, at approximately 4:00 p.m., Canadian Solar announced over the PR NEWSWIRE that Q1 2010 margins would be lower than previously forecast in a release entitled "*Canadian Solar Updates Expectations for Q1 2010*:"

> [Canadian Solar] now expects PV module shipments in the first quarter of 2010 to be approximately 189 MW to 191 MW, with gross margins of 13% to 13.5%.  This compares to prior expectations for shipments of approximately 180 MW to 190 MW and gross margin in the mid-teens.

In response to this bad news about lower than expected profit margins, Canadian Solar shares opened trading significantly lower on the morning of April 21, 2010, and closed trading for the day at $18.26 per share, a decline of $3.07 (14.4%) for the day.  Although the Company blamed shifting exchange rates, the declining margins were, in fact, attributable to improper revenue recognition in the fourth quarter of 2009, as the Company would be forced to admit at a later date.  In fact, the actual gross margin for the Company for this quarter would ultimately be reported as just 9.5%, far worse than even this bad news that sent the Company's shares down more than 14%.

## VI.     CANADIAN SOLAR'S SCHEME TO OVERSTATE SALES REVENUES

53.     In August of 2010, as described below, Canadian Solar would be forced to admit that it had improperly recognized $32.8 million in revenues, and had improperly failed to recognize another $16.1 million in expenses – *which combined to overstate the Company's Q4 2009 and annual 2009 financial results by more than $30 million*.  An excellent example of the fraud that led to this accounting fiasco can be found in transactions between Canadian Solar and SunValley, which was run by James Zhang, who was a friend of Yan Zhuang (an executive at Canadian Solar).

54.     On or about November 24, 2008, Canadian Solar entered into a "Territory Distribution Contract," dated November 17, 2008, with SunValley, a company located at 398 Lemon Creek Rd. in Walnut, California.  SunValley distributes solar modules and carries out various solar system integration projects throughout the United States.[1]

55.     Pursuant to this agreement, SunValley agreed to act as a distributor for certain of Canadian Solar's Mono/Poly Crystalline PV Modules throughout Southern California, Nevada

---

[1] Complaint, *Sunvalley Solar, Inc. v. Canadian Solar, Inc*., No. BC453272 (Sup. Ct. Cal. Los Angeles).

and Arizona.  Pursuant to the terms of this Agreement, SunValley agreed to purchase "not less than 1,500,000 Watts" during 2008 and 2009.[2]

**A.    SunValley Was Not Approved for Credit Sales**

56.    Sinosure is China's official export credit limit agency, offering export and credit insurance.  Canadian Solar had a policy to grant credit only to companies on the "Sinosure Limit List."

57.    SunValley was not on the Sinosure Limit List, a fact that was confirmed by an internal e-mail:

> November 12, 2009 e-mail from Xinhain Pen to Ashley Ni
> (Accounting Manager at Canadian Solar in California):  "Coverage
> for customer SunValley has been cancelled by Sinosure on
> September 30th.  The customer has serious default, so Sino refuses
> to approve coverage."

**B.    Canadian Solar Improperly "Parked" Inventory at SunValley it Had Reported as "Sold"**

58.    Beginning in early 2009, Canadian Solar began shipping large volumes of additional product to SunValley, which SunValley had not ordered.  Yan Zhuang (the Vice President of Global Sales of Canadian Solar), on behalf of Canadian Solar, advised SunValley orally that the additional product could be returned later if not sold by SunValley.  Yan Zhuang further told SunValley that, as an alternative, SunValley would be allowed to sell the unordered product at a lower price, should it choose to do so.[3]

59.    The additional unordered product shipped by Canadian Solar to SunValley resulted in SunValley warehousing product above and beyond what it immediately needed.[4]

60.    For example, on September 30, 2009, 550 pallets of Canadian Solar products were shipped to SunValley, and revenues were recognized by Canadian Solar on the "sale" of this product to SunValley during the third quarter of 2009.  Revenue from these "sales" was recognized upon shipment from China to the U.S.

---

[2] *Id.*, Exhibit A, p.8.

[3] *Id.* at ¶¶ 22-23

[4] *Id.* at ¶ 24.

61.     These "sales" of $5,764,430 were made pursuant to three purchase orders:  1) Purchase Order 10 for 2,080 modules (1,040 of CS6P-180 and 1,040 of CS6P-230) in the total amount of $754,000; 2) Purchase Order 11 for 17,170 modules in the amount of $3,702,960; and 3) Purchase Order 12 for 3,290 modules of CS6P-190 and 680 modules of CS6P-200 in the total amount of $1,307,470.

62.     Although Canadian Solar recognized the revenue from these three purchase orders in the third quarter, the sales were not final sales.  This product, in fact, arrived at the Long Beach port on or about October 9, 2009.  Although no bills of lading had been prepared, Canadian Solar decided to "park" this inventory at SunValley and recognized revenue on the product as if it were a legitimate sale.

63.     A sales meeting on November 11, 2009, was attended by, among others, Peter Schenck (in logistics at Canadian Solar), Dirk Sutton (also in logistics at the San Ramon, California office of Canadian Solar), Mike Miskovsky (V.P. of U.S. sales for Canadian Solar) and Gregory Ashley (V.P. Project Sales for Canadian Solar) and (by telephone) Charles Pimentel (Sales Manager for the Eastern U.S. for Canadian Solar) and Beverly Zhou (Regional Sales Manager for Canadian Solar and previously employed by SunValley).  At this meeting, Beverly Zhou stated that she was looking into selling certain of the product that had been parked at SunValley (and booked as sold by Canadian Solar) to DMSolar (a/k/a Brightwatts).  Peter Schenck stated that "we cannot buy back inventory in Q4 due to the audit trail for Q3."  He further stated that Yan Zhuang would not approve this transaction because the audit trail might uncover the improper nature of these previously recognized "sales" to SunValley.  Beverly Zhou stated that "we need to clear the SunValley inventory" and that both Defendant Qu and Yan Zhuang regretted parking inventory with SunValley and would not do so again in the future.  Although Mike Miskovsky offered to contact James Zhang (President of SunValley) at SunValley to make the transaction happen, Beverly Zhou insisted that DMSolar (Brightwatts) "does not want an invoice from SunValley, only Canadian Solar invoices."  She continued by asserting that Canadian Solar did not want to have its Q3 sales audited.  Mike Miskovsky

- 22 -

became upset, because he was looking to sell 1.6 MW of inventory to DMSolar (Brightwatts), which Canadian Solar did not have in its own inventory, but did have in the "sales" previously parked at SunValley.  Although Mike Miskovsky wanted to get the inventory to sell from SunValley, Beverly Zhou insisted that "No, you can't touch James' stock" and that "we can't sell it right now."  Peter Schenck added that "we don't want anyone looking at our Q3 numbers."

64.     On November 23, 2009, the San Ramon, California office of Canadian Solar had another sales meeting.  This meeting was attended by Gregory Ashley, Peter Schenck, Mike Miskovsky and, by telephone, Dirk Sutton, Beverly Zhou and Charles Pimentel.  At this meeting, Beverly Zhou said that Charlotte Xi Klein had agreed to issue a credit for the SunValley parked inventory to allow for its re-sale to DMSolar (Brightwatts).  Beverly Zhou asked Dirk Sutton to document the "return" from SunValley, but Sutton expressed discomfort with the transaction and did not want to take such an overt action without direct authorization from Canadian Solar's headquarters in China.  Beverly Zhou told him to contact Charlotte Klein (Global V.P. of Operations for Canadian Solar) and Yan Zhuang directly, but that she wanted a packing slip that day reflecting the transaction.

65.     In fact, this "re-sale" transaction of the inventory that had been improperly parked at SunValley was undertaken, as shown by the following internal e-mails:

- 11/24/2009 – David Li of DMSolar drafted an invoice identifying the "vendor" as Canadian Solar for Purchase Order No. 112309-01.

- 11/30/2009.  There were a series of e-mails on this date between Beverly Zhou and Dirk Sutton discussing the inventory being parked at SunValley, specifically providing that "DM inspected . . . out of SunValley stock."  These e-mails also questioned whether SunValley knew that DMSolar was picking up the parked inventory from SunValley.

- On December 2, 2009, David Li of DM Solar wrote "My truck is coming, but warehouse need approval from SunValley to release 2 extra panels."

- In a December 4, 2009 e-mail from Dirk Sutton to Eddy Ding, Ashley Ni, Yan Zhuang, and several other people, Mr. Sutton wrote:  "No I disagree.  The credit to SunValley should only be for the amount we are pulling and reselling

(1.6 MW).  SunValley can maintain control of the other
product until either we or they sell it.  I am certain that we
do not desire to negatively impact our revenue!"

- In an e-mail also dated December 4, 2009, Eddy responded
  "I just saw the credit note from sales support department . .
  . it indicated that SunValley will return 2.76 MW to CSI
  and we will only resale 1.6 MW to DMSolar.  Means that
  we will have 1.116 sales return and 1.0 MW resales in Q4.
  Am I right?  If so, I will have to write off some revenue this
  month."

- On December 7, 2009, Dirk Sutton forwarded SunValley
  invoice No. 7099-A to Wendy Zhang (an accounting
  assistant at Canadian Solar) and Ashley Ni.  Mr. Sutton
  informed Ashley Ni that James Zhang (the President of
  SunValley) was insisting upon a storage fee for parking the
  Canadian Solar inventory at SunValley, and approved
  payment of the invoice for the storage fee.

- On December 10, 2009, Dirk Sutton wrote an e-mail to
  Beverly Zhou, Ashley Ni, Greg Ashley and Mike
  Miskovsky (among others) stating:  "Subject: 1.6 mw
  order.  Great job on salvaging this deal . . . Thanks for the
  effort here.  This is an awesome sale for the company and
  reduces [SunValley's] inventory significantly."

66.    SunValley agreed to this arrangement because it had heavily invested in its

partnership with Canadian Solar and could not afford for this relationship to break down given

the significant investment it had made in connection with the Territory Distribution Contract and

its customer commitments as a result of this contract.

67.    On March 11, 2010, Dirk Sutton wrote an e-mail to SunValley's office manager

stating that "I would like to arrange transfer of the remaining product in the SunValley

warehouse to our facility in NCA. . .I estimate that we will need 8 each 53 foot trucks to

accommodate the logistics, loading 39 pallets per (double stack)."

### VII.    THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF THE COMPANY IS BELATEDLY REVEALED

68.    On May 28, 2010, Canadian Solar shares closed trading at $12.95 per share.

69.    On June 1, 2010, Canadian Solar announced over the PR NEWSWIRE in a press

release entitled "Canadian Solar Updates 1Q10 Performance; Postpones June 2 Quarterly Call"

that it would delay release of its financial results for the first quarter of 2010 for the period

ending March 31, 2010, due to the Audit Committee of the Board opening an investigation into

the results, the SEC's subpoena and the revelation that the results for the fourth quarter of 2009

were in question.  The Company stated that the Audit Committee launched an investigation in

response to a subpoena issued by the SEC "requesting documents from the Company relating to,

among other things, certain sales transactions in 2009."  The Company issued a press release

titled "Canadian Solar Updates 1Q10 Performance; Postpones June 2 Quarterly Call."  In the

press release, the Company, stated in relevant part:

> The Company may revise the 4Q09 net revenues numbers due to
> the company's intention to recognize sales only after receiving full
> cash payments from certain customers and due to certain
> subsequent return of goods after the quarter end.  These sales
> transactions are deferred to Q1 and Q2 of 2010.  Full year 2009 net
> revenues may be revised accordingly.

70.     Analysts immediately raised questions about the seriousness of Canadian Solar's

investigation.  One analyst published an article at *TheStreet.com* on June 2, 2010, questioning

why customers of Canadian Solar were returning goods that were shipped and how the Company

was recognizing revenues.  The author stated:

> One analyst who did not want to be quoted speculating on the
> CSIQ accounting investigation noted that CSIQ has been buying
> high level of third-party cells to make a portion of its solar module
> because demand has been at such a high level.  Therefore, it's
> possible a quality control problem could have originated in a solar
> component sourced from a third-party – though, again, it's only
> logical speculation at this point.  The analyst said the key issue is if
> the accounting investigation ultimately does hinge on a quality
> control issue with Canadian Solar.  With the solar module having
> already become a low-cost commodity, any knock on a solar
> company's quality control would give customers every reason to
> head to any of the hundreds of other low-cost companies with their
> orders.
>
> Canadian Solar did specifically use the language "certain
> customers" in talking about the accounting issues, and that allows
> for the logical speculation that a quality control issue could have
> been related to a specific group of sales that used third-party
> modules.
>
> "Why would any customer return any solar product in the past few
> quarters given how strong demand has been if there wasn't
> something wrong with it?" one solar analyst asked.

On the other hand, with so much left out of the Canadian Solar press release, it is impossible to say that the return of Canadian Solar goods wasn't simply related to double ordering by customers, or related to certain customers going out of business and as a result returning goods.

Mark Bachman, analyst at Auriga Securities, noted that most revenue recognition in solar id [*sic*] predicated upon the fact that "as soon as a solar product leaves the dock ownership is transferred."

"The Canadian Solar press release is very anomalous, and it is impossible to be sure what is going on right now; what was in the press release is what solar companies generally do:  sell product and if they don't get paid, have an accounts receivable charge," said one analyst who did not want to be quoted pending more information from Canadian Solar.  "We don't know the magnitude of the returns we are dealing with either," the analyst added.

The change in revenue recognition could mean that CSIQ will see a revenue bump in the first two quarters of 2010.  However, it also presents the possibility that there is the dreaded Sarbanes-Oxley "material weakness" in Canadian Solar's internal control.  A material weakness can be rectified, but it still leaves investors asking themselves how long before the overhang from the accounting investigation is removed from Canadian Solar shares.

71.    In response to this terrible news, Canadian Solar shares dropped over the two day period from $12.95 per share to close trading on June 2, 2010, at $10.17 per share – a loss of $2.78 per share (21.5%).

72.    On August 19, 2010, the Company announced its restated financial results for the fourth quarter of 2009, which included material restatements from the healthy *profit* of more than $15 million ($0.36 per share) that had been previously reported to an admitted a *loss* of $15.4 million ($0.38 per share), thus confirming the market's reaction to the bad news finally disclosed on June 1, 2010.

## VIII.   CANADIAN SOLAR'S FALSE AND MISLEADING FINANCIAL STATEMENTS AND STATEMENTS CONCERNING ITS SYSTEM OF INTERNAL CONTROL

73.    In order to inflate Canadian Solar's revenues, earnings and assets improperly during the Class Period, Defendants undertook a scheme whereby they improperly recognized revenues from millions of dollars of sales as if they were final sales, but when they were, in fact, either contingent sales, sales made on credit for which collection was uncertain, or were just

- 26 -

"sham" sales of inventory that was merely "parked" at another company's warehouse. These accounting manipulations were only possible because Canadian Solar's system of accounting control was hopelessly deficient, despite sworn certifications to the contrary from the Individual Defendants.

**A.      System of Internal Control**

74.      A fully functioning system of accounting internal controls is important to the integrity of the reported financial results of the company.  Assurances of strong internal controls are particularly important in the case of foreign companies and smaller companies, whose reported financial results might otherwise be viewed with some skepticism.  Following the Enron and Worldcom scandals, congress moved quickly to require the top officials of public companies to certify that their accounting internal controls were working properly.

75.      Section 404 of the Sarbanes-Oxley Act of 2002 requires management to assess the effectiveness of a company's internal control structure and financial reporting procedures. Further, SEC rules require management to report publicly all material weaknesses in the Company's internal controls.  The Individual Defendants were required under Rule 302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's "internal control over financial reporting."  Federal regulations require corporate officers to report on the effectiveness of internal controls over financial reporting, and they prohibit those officers from characterizing the controls as "effective" if "there are one or more material weaknesses . . .." 17 C.F.R. § 229.308(a)(3).

76.      As set forth above, in connection with the Company's June 8, 2009 Form 20-F, the Individual Defendants executed the applicable Rule 302 certification.  Management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes-Oxley Act, were materially false and misleading because the Company's internal controls were ineffective.

77.      Canadian Solar was only able to employ the accounting schemes described herein because of a faulty system of accounting controls, which allowed the Company to, among other

transgressions, "park" millions of dollars of inventory at friendly companies and recognize revenues from the transactions as if they were legitimate sales when they were not.

**B.      False and Misleading Financial Statements**

78.      These improper accounting practices and manipulations were in direct violation of GAAP and SEC rules, as described below, and resulted in materially overstated financial results for the quarters ended March 31, 2009, June 30, 2009, September 30, 2009, and December 31, 2009, as well as the year ended December 31, 2009.

79.      GAAP is the set of conventions, rules and procedures which constitute the professional standards of the accounting profession.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading or inaccurate.

80.      Although Canadian Solar recognized revenues when the product was shipped to SunValley, it was plainly improper to do so pursuant to clear GAAP and SEC authority.

81.      The authoritative provisions of GAAP are set forth in the FASB Accounting Standards Codification ("ASC"), which was completed by the Financial Accounting Standards Board in 2009.  This codification is not a change in GAAP, but rather a reorganization of existing principles to provide greater ease of usage.

**1.      Revenue Recognized From Sham Sales**

82.      As described above, the Q3 2009 transactions with SunValley were not legitimate sales, but rather just a sham transaction of parking inventory at a third-party company as if it were sold.  GAAP and SEC guidelines require that a sale is not consummated until all risks of ownership of the product has transferred.  Staff Accounting Bulletin 104, Securities and Exchange Commission.  Because the "sales" to SunValley did not transfer the risks of ownership, and were, in fact, never agreed to be actual sales by the parties, Canadian Solar improperly recognized the revenues from these transactions.

### 2.      Revenue Recognized on Contingent Sales

83.      ASC 605-15-25 provides criteria on recognizing revenues on a sale in which a product may be returned, or where the seller's price may be subsequently changed by the buyer depending on certain conditions.  Pursuant to ASC 605-15-25, revenue from a sales transaction may not be recognized at the time of the sale if (among other conditions): 1) The seller's price to the buyer is not substantially fixed or determinable at the time of the sale; 2) The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on the resale of the product;[5] *or* 3) the amount of future returns cannot be reasonably estimated.

### 3.      Revenue Recognized When Collection is Uncertain

84.      GAAP requires that when collection of a receivable is uncertain, the seller must use either the installment method or the cost recovery method of accounting to recognize the transaction.  ASC 605-10-25.  Both of these methods require a deferral of recognition of gross profit until cash has been collected.

85.      As described above, SunValley was not a creditworthy customer, and had, in fact, been rejected by Sinosure.  Collection of receivables from SunValley, even had the transaction been a legitimate sales transaction, was obviously far from certain.  Accordingly, Canadian Solar was not entitled to recognize any gross profits from transactions from SunValley until cash had actually been collected.

86.      Canadian Solar recognized the entire amount of the $5,764,430 as revenue in Q3 of 2009, and recognized the related gross profit in its entirety, even though the collection of such amounts from SunValley was far from certain, in violation of ASC 605-10-25.

### IX.      SCIENTER

87.      As described above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants Canadian Solar, Qu and Chien knew or recklessly disregarded that the statements set forth above were materially false and misleading when made.

---

[5] If the buyer does not pay at the time of the sale and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product, then this condition is not met.

88.     Defendants had motive and opportunity to commit the misconduct described herein in order to complete Canadian Solar's secondary public offering of 6.9 million shares, which raised more than $108 million from investors at an offering price of $15.75 per share.

89.     In addition, the facts as described above demonstrate that Defendants Canadian Solar, Qu and Chien exhibited conscious misbehavior or recklessness in their behavior in that these Defendants knew facts or had access to information suggesting that their public statements were not accurate.  For example, at a sales meeting on November 11, 2009, high ranking Company officials, including officials who reported directly to the Individual Defendants, made the following statements demonstrating their knowledge that the "parking" of inventory at SunValley upon which revenue had already been recognized was contrary to GAAP and the federal securities laws:

- A logistics employee for the Company (Peter Schenck) informed his colleagues that "we cannot buy back inventory in Q4 due to the audit trail for Q3" and further elaborating that "we don't want anyone looking at our Q3 numbers.";

- Peter Schenck further providing that Yan Zuang (the Company's Global V.P. of sales and Marketing) would not approve of the transaction to sell DMSolar (Brightwatts) goods that had previously been recognized as "sold" to SunValley because the audit trail might uncover the improper nature of the previously reported "sales" to SunValley.;

- Beverly Zhou stating that Yan Zuang and Defendant Qu both "regretted parking inventory with SunValley and would not do so again in the future.";

- Beverly Zhou expressing reluctance to execute the DM Solar (Brightwatts) transaction because Canadian Solar did not want to have its Q3 sales audited; and

- Beverly Zhou insisting that "No, you can't touch James' [SunValley's] stock" and that "we can't sell it right now."

These statements conclusively demonstrate that not only did the Company's executives know that the revenues had improperly been recognized on the SunValley transaction, but that they needed to continue to conceal this fact, even to the point of harming a potential sale because "we don't want anyone looking at our Q3 numbers" (already recognizing the revenues on the

- 30 -

SunValley transaction).  The admissions of the knowledge of the misconduct continued in various e-mails regarding the SunValley/DMSolar (Brightwatts) transaction:

- 11/30/2009.  There were a series of e-mails on this date between Beverly Zhou and Dirk Sutton discussing the inventory being parked at SunValley, specifically providing that "DM inspected . . . out of SunValley stock."  These e-mails also questioned whether SunValley knew that DMSolar was picking up the parked inventory from SunValley.

- On December 2, 2009, David Li of DM Solar wrote, "My truck is coming, but warehouse need approval from SunValley to release 2 extra panels."

- In a December 4, 2009 e-mail from Dirk Sutton to Eddy Ding, Ashley Ni, Yan Zhuang, and several other people, Mr. Sutton wrote:  "No I disagree.  The credit to SunValley should only be for the amount we are pulling and reselling (1.6 MW).  SunValley can maintain control of the other product until either we or they sell it.  I am certain that we do not desire to negatively impact our revenue!"

- In an e-mail also dated December 4, 2009, Eddy responded, "I just saw the credit note  from sales support department . . . it indicated that SunValley will return 2.76 MW to CSI and we will only resale 1.6 MW to DMSolar.  Means that we will have 1.116 sales return and 1.0 MW resales in Q4.  Am I right?  If so, I will have to write off some revenue this month."

90.     Based upon these e-mails and comments in the November 11, 2009 sales meeting, there can be no dispute that:  1) these Company executives knew that the recognition of revenues in Q3 2009 on the SunValley transaction was improper; 2) that they participated in a scheme to continue to improperly recognize this revenue; and 3) Company officials at the highest levels (Qu and Zhuang) were aware of the misconduct.

91.     Further, the size and nature of the restatements required to be made by Canadian Solar in its 2009 financial reports is additional evidence of scienter.  The Q4 2009 financial results were originally a reported *profit* of more than $15 million, but the restated results reported a *loss* of more than $15 million for Q4 2009.  The size and scope of this restatement, combined with the fundamental nature of the accounting issues are compelling evidence that the Defendants were either aware of, or reckless in not being aware of, the fundamental problems with the Company's accounting, financial reporting and system of accounting internal controls.

92.     In sum, the above conduct was highly unreasonable and represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to

the Defendant or so obvious that the Defendant must have been aware of it.

## X.     LOSS CAUSATION

93.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic losses suffered by Plaintiffs and the Class.

94.     Throughout the Class Period, as set forth above, the market price of Canadian

Solar shares was inflated by the material omissions and false and misleading statements made by

the Company and Defendants Qu and Chien, which were widely disseminated to the securities

markets, investment analysts and the investing public.  The false and misleading statements

materially misrepresented to the market the Company's financial results and prospects, and

caused Canadian Solar shares to trade at prices in excess of their true value.

95.     As a result, Lead Plaintiffs and the Co-Lead Plaintiff purchased Canadian Solar

shares at artificially inflated prices.  When the truth about Canadian Solar's financial results and

prospects was revealed to the market through several partial disclosures, the price of Canadian

Solar shares declined in response, as the artificial inflation caused by Defendants'

misrepresentations and omissions was removed from the price of Canadian Solar shares, thereby

causing substantial damages to the Lead Plaintiffs, the Co-Lead Plaintiff and the Class.

96.     Immediately prior to the Class Period, Canadian Solar shares closed trading at

$10.01 per share.  As the Company began misrepresenting its financial results and future

prospects, its share price began to rise significantly.  On May 26, 2009, following the

announcement of better-than-expected financial results for Q1 2009, Canadian Solar's shares

rose 10.2% to close at $11.03 per share, and rose another 9.5% the following day to $12.08 per

share based on the filing of a Form 6-K containing these reported financial results.  On August 6,

2009, Defendants reported excellent financial results for Canadian Solar for Q2 2009.  This

excellent reported financial news drove Canadian Solar's shares up $2.83 per share on August 6,

2009, to close at $18.95 per share, a 17.6% gain from the previous day's closing price of $16.12

per share.  On November 17, 2009, Defendants reported more excellent financial results – this time for Q3 2009.  In response, Canadian Solar shares rose another 2.1% on November 17, 2009, to close at $20.11 per share.  With this continuing drumbeat of excellent reported financial results, Canadian Solar shares traded as high as $33.68 on January 6, 2010, which is the Class Period high for the Company's share price.

97.     On February 19, 2010, the Defendants caused the Company to issue its first partial disclosure that all was not rosy with the financial prospects of the Company.  On that day, the Company disclosed that its Q4 2009 profit margins would be significantly lower than previously projected.  Although the Company blamed this bad news on other alleged factors, the gross margins were beginning to shrink in large part because the Company had been manipulating its financial results by recognizing substantial amounts of revenue prematurely in past quarters that should have been recognized in Q4 2009.  The resulting shortfall in revenues in Q4 2009 directly impacted and shrank the Company's gross margins for the period.  The partial disclosure of February 19, 2010, sent Canadian Solar shares down $3.89 per share (15.7%) to $20.85 per share from a close of $24.74 the previous day.

98.     On April 20, 2010, Canadian Solar disclosed to the market that gross margins for Q1 2010 would also be much lower than previously forecast.  In response to this bad news, Canadian Solar shares dropped another $3.07 (14.4%) for the day from $21.33 to $18.26 per share.  This was another partial disclosure of the revenue recognition issues that had caused the first three quarters of 2009 to be materially overstated.

99.     On June 1, 2010, the Company was finally forced to admit the major problems in its revenue recognition procedures, including the fact that the SEC had issued a subpoena "requesting documents from the Company relating to, among other things, certain sales transactions in 2009."  The Company also admitted that it might be forced to restate its previously reported revenue and net income for 2009.  The market reacted by driving down the price of Canadian Solar's shares from $12.95 to $10.17 over the two-day period following this announcement, a loss of $2.78 or 21.5% per share.

- 33 -

100.    As a result of their purchases of Canadian Solar shares during the Class Period, and the corrections removing the artificial inflation of the prices paid for those securities, Lead Plaintiffs, the Co-Lead Plaintiff and the Class suffered economic harm under the federal securities laws.

## COUNT I

**Violations of § 10(B) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

101.    Except and unless otherwise indicated, Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

102.    This Count is asserted against all Defendants for violations of § 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

103.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company named in this Count, they were able to control and did control the content of the public statements contained herein and, with knowledge or in reckless disregard, they caused the above complained of public statements to contain misstatements and omissions of material facts as alleged herein.

104.    Plaintiffs' investments in the Company lost value as a result of the Defendants' representations being untrue and as a result of the true facts being omitted by the Defendants.

105.    Plaintiffs and the Class have suffered damages in that Plaintiffs and the Class paid artificially inflated prices for shares of Canadian Solar.

106.    The Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities law.

- 34 -

## COUNT II

## Violations of §20 of the 1934 Act Against the Individual Defendants

107.    Except and unless otherwise indicated, Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

108.    This Count is asserted against the Individual Defendants for violations of §20(a) of the 1934 Act.

109.    The Individual Defendants directly or indirectly control Canadian Solar.

110.    Because of their positions of control, these Defendants were able to, and did, directly or indirectly, control the conduct of the persons directly liable for primary violations of § 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

111.    At the time that the Defendants made false and misleading statements and omissions of material facts alleged above in violation of § 10(b) and Rule 10b-5, the Defendants named in this Count either knew of, or recklessly disregarded, their falsity.

112.    Each of the Defendants in this count had the power to control or influence the particular transactions giving rise to the primary violations of § 10(b) and Rule 10b-5 as alleged herein, and exercised the same.  Each of the Defendants in this count either directly or indirectly induced the primary violations of law complained of herein.

113.    By virtue of their positions as "controlling persons," the Individual Defendants in this count are liable pursuant to §20(a) of the 1934 Act.

114.    As a direct and proximate cause of the wrongful conduct set forth in this count, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Fund shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

- 35 -

B.      Awarding compensatory damages in favor of Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescissionary damages; and

E.      Such equitable, injunctive or other relief as deemed appropriate by the Court.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: March 11, 2011

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

by ____/s/ Steve W. Berman_____
   Steve W. Berman
   Tyler S. Weaver
   Karl P. Barth
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
tyler@hbsslaw.com

Jason A. Zweig
HAGENS BERMAN SOBOL SHAPIRO LLP
One Penn Plaza, 36th Floor
New York, NY 01119
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
jasonz@hbsslaw.com

Reed Kathrein
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

*Lead Counsel for Plaintiff s
and the Proposed Class*

Jeffrey Alan Klafter
KLAFTER, OLSEN & LESSER, LLP
Two International Drive
Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200
Facsimile: (914) 934-9220
jak@klafterolsen.com

Kurt B. Olsen
KLAFTER OLSEN & LESSER LLP
1250 Connecticut Ave., N.W., Suite 200
Washington, DC  20036
Telephone: (202) 261-3553
Facsimile:  (202) 261-3533
ko@klafterolsen.com

Todd S. Collins
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3040
Facsimile: (215) 875-5715
tcollins@bm.net

*Co-lead counsel for Plaintiff s
and the Proposed Class*

- 37 -

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that March 11, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United State Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/ Steve W. Berman
Steve W. Berman

- 38 -

# Mailing Information for a Case 1:10-cv-04430-RWS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

- **Jeffrey Philip Campisi**
  jcampisi@kaplanfox.com

- **Todd S. Collins**
  tcollins@bm.net,nmara@bm.net

- **Nadeem Faruqi**
  nfaruqi@faruqilaw.com

- **D. Seamus Kaskela**
  skaskela@btkmc.com

- **Reed Richard Kathrein**
  reed@hbsslaw.com,peterb@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Jeffrey Alan Klafter**
  jak@klafterolsen.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,lpvega@pomlaw.com

- **Terri L. Lilley**
  terri.lilley@lw.com

- **Gregory Bradley Linkh**
  glinkh@murrayfrank.com

- **Pamela A. Mayer**
  pmayer@kaplanfox.com

- **Kim Elaine Miller**
  kim.miller@ksfcounsel.com,kimmiller225@yahoo.com

- **David S. Nalven**
  davidn@hbsslaw.com,Seanh@hbsslaw.com

- **Steven D. Resnick**

sresnick@btkmc.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Shane Thomas Rowley**
  srowley@faruqilaw.com

- **Evan J. Smith**
  esmith@brodsky-smith.com

- **Joel B. Strauss**
  Jstrauss@kaplanfox.com

- **Antonio Vozzolo**
  avozzolo@faruqilaw.com

- **Joseph Harry Weiss**
  jweiss@weisslurie.com,infony@weisslurie.com

- **Jason Allen Zweig**
  Jzweig@kaplanfox.com,jasonz@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
David M. Promisloff
Barroway Topaz Kessler Meltzer & Check,LLP
280 King of Prussia Road
Radnor, PA 19087

David J. Schindler
Latham & Watkins LLP (LA)
355 South Grand Avenue
Los Angeles, CA 90071

Tyler S. Weaver
Hagens Berman Sobol Shapiro LLP
1918 Eighth Ave Suite 3300
Seattle, WA 98101
```