UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

LABIB JANBAY, Individually and on Behalf
of All Others Similarly Situated,

                    Plaintiff,                10 Civ. 4430

   -against-                            OPINION

CANADIAN SOLAR, INC., SHAWN QU and
ARTHUR CHIEN,

                    Defendants.

------------------------------------------X

A P P E A R A N C E S:


        <u>Lead Counsel for Plaintiffs and the Proposed Class</u>

        HAGENS BERMAN SOBOL SHAPIRO LLP
        1918 Eighth Avenue, Suite 3300
        Seattle, WA 98101
        By:  Steve W. Berman, Esq.
             Erin K. Flory, Esq.
             Karl P. Barth, Esq.
             Jason A. Zweig, Esq.
             Reed Kathrein, Esq.


        <u>Co-Lead Counsel for Plaintiffs and the Proposed Class</u>

        KLAFTER, OLSEN & LESSER, LLP
        Two International Drive, Suite 250
        Rye Brook, NY 10573
        By:  Jeffrey Alan Klafter, Esq.
             Kurt B. Olsen, Esq.

        BERGER & MONTAGUE, P.C.
        1622 Locust Street
        Philadelphia, PA 19103
        By:  Todd S. Collins, Esq.

<u>Attorneys for the Defendants</u>

LATHAM & WATKINS LLP
855 Third Avenue
New York, NY 10022
By:  Timothy P. Crudo, Esq.
     David J. Schindler, Esq.
     Matthew L. Kutcher, Esq.

**Sweet, D.J.**

Defendant Canadian Solar Inc. ("CSI" or the "Company"), Shawn Qu ("Qu") and Arthur Chien ("Chien") (the "Individual Defendants") (collectively, the "Defendants") have moved pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), to dismiss the amended consolidated complaint of plaintiff Labib Janbay ("Janbay"), individually and on behalf of others similarly situated (collectively, the "Plaintiffs"), for violations of the federal securities laws ("Amended Complaint" or "AC").

Although the Plaintiffs have alleged an overstatement of earnings as a result of a sale transaction improperly recorded, the Plaintiffs have failed to adequately allege a Securities Act violation. For the reasons set forth below, the Defendants' motion is therefore granted and the AC is dismissed with prejudice.

## I. Prior Proceedings & Facts

The prior proceedings and facts underlying this action are set out in this Court's opinion of March 30, 2012, which

granted the Defendants' motion to dismiss the original

complaint.  See Janbay v. Canadian Solar, Inc., No. 10 Civ.

4430(RWS), 2012 WL 1080306 (S.D.N.Y. March 30, 2012) (the "March

30 Opinion").  The facts relevant to the instant motion are

summarized below and familiarity with the March 30 Opinion is

assumed.


On March 30, 2012, this Court dismissed the

Plaintiffs' initial complaint (the "Initial Complaint") and held

that Plaintiffs had failed to allege falsity, scienter and loss

causation.  See generally Janbay, 2012 WL 1080306.  The March 30

Opinion noted that Plaintiffs had only identified the Sun Valley

Solar, Inc.'s ("Sun Valley") sales transaction on September 30,

2009 as an alleged "sham" but that the Initial Complaint did not

sufficiently allege that the transaction was improperly

recorded.  Id. at *4-7.  In addition, the March 30 Opinion

rejected Plaintiffs' reliance on allegations from the Sun Valley

complaint (the "Sun Valley Complaint") as well as purported

excerpts of CSI emails and descriptions of sales meetings.  Id.


On April 19, 2012, the Plaintiffs filed the AC, which

alleged that a sale to Sun Valley in the third quarter ("3Q") of

2009 was purportedly a "sham" transaction, and as a result CSI's

4

financial results for 3Q 2009 and 4Q 2009, as well as statements about its internal controls, were false and misleading. Plaintiffs also contended that CSI's 4Q 2009 financial report was false and misleading for improperly recognizing revenue from at least two "transactions" like the 3Q Sun Valley bogus "sale." (AC ¶¶ 71, 74, 86).

In the AC, Plaintiffs revised the class period to begin from October 13, 2009 to June 1, 2010 (the "Class Period"), when it is alleged that CSI made false pre-offering statements about its 3Q revenue and shipments.  (AC ¶¶ 1, 5). Counsel for the Plaintiffs also verified the facts alleged in the Sun Valley Complaint with Sun Valley's counsel.  (AC ¶ 38).

Four confidential witnesses ("CWs") were identified as former employees of CSI's U.S. Office in San Ramon, some by position and dates of employment ("CW1" and "CW2"), and some by placing them personally at the meetings or by having had access to documents ("CW3" and "CW4").  (AC ¶¶ 42-45).  Plaintiffs also noted that the San Ramon office was small, consisting of four to six people at any time, and that the branch reported directly to the Chinese home office.  (AC ¶ 41).

5

CW1 was hired in February 2009, eight months before the Class Period, and left in May 2010, before the restatement and SEC investigation. (AC ¶ 42). CW1 was hired to assume the position of Acting President of Canadian Solar (USA). (Id.). According to CW1, CSI and Yan Zhuang ("Zhuang"), Vice President of Sales and Marketing, had personal knowledge that CSI had previously sold the product warehoused at Sun Valley to Regenesis Power in a legitimate transaction, and some of the product had been delivered to Florida (AC ¶ 42). In addition, CW1 reported that Zhuang terminated that deal, ordered the San Ramon office to find new customers for the product, and the "suddenly" instructed everyone that Sun Valley "was going to take it all." (Id.).

CW2 worked for CSI as the Finance Director from April 2009 to September 2009. (AC ¶ 43). CW2 reported that he had personal knowledge of Qu's "tight" control of CSI. (AC ¶ 43). In 3Q 2009, CW2 worked on the Regenesis deal. (Id.). CW2 stated that Zhuang "pulled the plug" on the deal because he was not comfortable with the Regenesis "people," and that per Zhuang's instruction, the solar panels destined for Regenesis were then redirected to Sun Valley." (Id.). According to CW2,

Sun Valley was an unreliable, difficult customer that resisted paying CSI for product. (Id.).

CW3 worked in the San Ramon office during all pertinent times and had first-hand knowledge of CSI from attendance at sales meetings, personal conversations and reviewed emails.  (AC ¶ 44).  These meetings often included CW1, Peter Schenck ("Schenck"), the Regional Manager US, Dirk Sutton ("Sutton"), Logistics, Beverly Zhou ("Zhou"), Director of Business Development; Charles Pimentel ("Pimentel"), Sales Manager Eastern US; Michael Miskovsky ("Miskovsky"), U.S. General Manager and Vice President of U.S. Sales, and administrative support personnel. (Id.).

CW3 allegedly got the impression from "general conversation," including frequent chats with Zhuang and Sutton that the company was struggling to make its 3Q 2009 numbers. (Id.).  CW3 stated that Zhuang announced that he had a sale in Europe of 20-30 megawatts, which CW3 concluded was "very suspicious."  (Id.).  He also reported that CSI recognized revenue prematurely, and issued a press release representing that it made or exceeded its 3Q numbers, while CW3 and the rest of the San Ramon office received an email from Charlotte Klein

("Klein") stating that the San Ramon office was not making money and had to cut expenses. (Id.).

On November 17, 2009, CW3 allegedly attended a sales meeting attended by Schenck, Miskovsky, Sutton, Pimentel, Zhou (by phone) and four others at which Zhou stated she had a 1.6 megawatt order for Brightwatts and that she would fill the order with product that CSI had parked with Sun Valley.  (Id.). Schenck objected that Zhuang would oppose buying back inventory in the 4Q because of the "audit trail."  (Id.).  Zhou responded that "we need to clear the Sun Valley inventory" and that both "Shawn [Qu] and Yan [Zhuang] regretted dumping inventory on Sun Valley and won't do it again in the future" and warned that "we don't want to have our Q3 sales audited," which the Sun Valley transaction could trigger.  (Id.).  CW3 remembered an earlier discussion, in which Zhuang had told him the same thing, that "Shawn [Qu] wanted to clear inventory" but "you don't want credit backs on Q4 to Q3 because of the audit trail." (Id.). CW3 also stated that Miskovsky wanted to contact Sun Valley to obtain the inventory but Zhou and Schenck insisted that he not do so and that Zhou told him, "No, you can't touch [Sun Valley] stock [because] [w]e can't sell it right now," and Schenck stated that "we don't want anyone looking at Q3 numbers."

8

(Id.).  Zhou eventually obtained authorization to sell the Sun
Valley stock, after which the San Ramon office had another sales
meeting on November 23, 2009, that Schenck, Zhou, Miskovsky,
Sutton, Pimentel, CW3 and others attended.  (Id.).  At the
meeting, Zhou stated she obtained Klein's agreement to credit
Sun Valley for the inventory to be sold to Brightwatts, and she
wanted the office to execute that transaction immediately.
(Id.).

        CW4 worked out of the San Ramon office for all or part
of the Class Period and created summaries of emails that
allegedly further indicated that the Sun Valley "sale" was
intended to improperly recognize revenue.  (AC ¶ 45).  CW4
reported that when Zhuang learned that some of the product was
not shipped before the end of the 3Q, he insisted that the Sun
Valley "sales" must be "fixed as of September (Q3)" and demanded
"Very Sensitive – Fix it."  (Id.).  In addition, CW4's notes
from various emails stated that CSI paid rent to Sun Valley for
storing its product and that DMSolar purchased from CSI the 1.6
megawatts of inventory that Sun Valley was warehousing.  The
notes also referred to shipments from Sun Valley to DMSolar,
discussed the best amount to credit Sun Valley for product sold
to DMSolar because credit full amount would require writing off

9

revenue but "we do not desire to negatively impact our
revenue!", included invoices for warehousing 653 pallets of CSI
inventory in the Sun Valley warehouse, explanations that the
"[r]ental expense from Sun Valley warehouse" was "[b]ecause of
insufficient WH space, we also used Sun Valley's WH for
temporary storage purpose in Q4" and arrangements for the
transfer of remaining CSI inventory from Sun Valley to CSI.
(Id.).

    According to the Plaintiffs, the 2010 August
restatement identified customer transactions consistent with the
alleged improprieties of the 3Q Sun Valley transaction, and
identified other similar customer transactions, (AC ¶¶ 86-91).
Management's allegedly admitted to improper accounting of year-
end 2009 in response to the auditor's findings (AC ¶¶ 55, 87),
the Audit Committee and auditors signed off only on the
restatement of year-end numbers – one quarter (AC ¶¶ 88, 89),
and the restatement is for unidentified transactions that are
consistent with the Sun Valley transaction and the other
customer transactions noted by the SEC (AC ¶¶ 8, 38).  According
to the AC, along with the restatement in August, the auditors
found and CSI admitted to not maintaining revenue-recognition
controls throughout 2009, consistent with the facts showing the

10

intent to prematurely recognize the Sun Valley revenue.   (AC ¶¶ 7, 55).   In addition, on the August 19th conference call, Qu and Chien refused to answer questions except to say that Canadian Solar had reasons to doubt that these customers intended to pay and did not explain how "subsequent events" justified cutting $21 million out of 2009 other than the general statement that there were sales to customers for which "by December 31 [2009] the collection is not assured, so we decided to convert to a more conservative sales recognition method for certain customers."   (AC ¶ 87).

According to the Plaintiffs, CSI's shares had been downgraded by a market analysis one month before its public offering, from "Outperform" to "Neutral." (AC ¶¶ 3, 29).   On September 28, 2009, Barron's published an interview with a respected solar-energy analyst, who reiterated his bearish call on the sector due to increasing oversupply and softening demand. (AC ¶ 30).

On October 13, 2009, CSI issued a press release allegedly spotlighting the 3Q as demonstrating increasing demand and profitability and represented that it expects 3Q shipments "will exceed the high-end of its prior guidance" and that CSI

was "raising its guidance for the full year of 2009," (AC ¶ 58).
The following day, Qu warranted that "[d]emand has continued to
be strong . . . ." (Id.).  The next day, CSI filed with the SEC
a prospectus of Form 424B5 with an allegedly-false statement
that CSI "only recognize[s] revenues when prices to the seller
are fixed or determinable, and collectability is reasonably
assured." (AC ¶ 60).

On October 22, 2009, CSI announced the completion of
its follow-on public offering of an additional 6,000,000 shares
of CSI common stock.  (AC ¶ 62).  The Company sold 6.9 million
shares of common stock at a public offering price of $15.75 per
share, including 900,000 shares purchased by the underwriters in
connection with their exercise, in full, of their options to
purchase additional shares in connection with the offering.
(Id.).  CSI received a total net proceeds of approximately
$103.3 million from this offering.  (Id.).

On November 17, 2009, CSI issued a press release over
the PR Newswire entitled "Canadian Solar Reports Third Quarter
2009 Results and Issues 2010 Guidance" announcing its financial
results for the 3Q 2009.  The release reported revenue at the
high end of its October 13 guidance and reiterated 4Q shipments:

12

> Net revenues for the third quarter of 2009 were
> $213.1 million, compared to net revenues of
> $114.2 million for the second quarter of 2009 and
> $252.4 million for the third quarter of 2008.

(AC ¶ 63).

Qu explained to investors that the spectacular results stemmed from CSI's successes:

> We broke our previous records on both MW shipment
> volumes and net profit in this quarter. The
> significant increases in sales and earnings were
> the result of the successful implementation of
> our global sales strategy combined with our
> strong brand name recognition, cost control and
> effective supply chain management.

(Id.).

According to Plaintiffs, CSI manipulated its earnings to meet analysts' expectations and hide the deflating demand for its product just before its secondary offering, (AC ¶¶ 44(a), 63, 65), and they contend that the Sun Valley consignment was just one part of a series of similar transactions for which CSI is alleged to have improperly recognized revenue in other suspect transactions.  (AC ¶¶ 44(a), 87 71, 74, 86) (admission that revenue improperly recognized for "certain" unidentified customers).

The SEC's still-pending investigation led CSI to admit that it had been recognizing revenue prematurely for multiple transactions and to disclose that it would delay release of its financial results for the first quarter of 2010 for the period ending March 31, 2010, for a number of reasons relating to the SEC investigation.  (AC ¶ 71).  CSI stated that it "may revise the 4Q09 net revenues numbers due to the company's intention to recognize sales only after receiving full cash payments from certain customers and due to certain subsequent return of goods after the quarter end," (Id.).  According to Plaintiffs, CSI restated its fiscal year 2009 and 4Q 2009 results, admitting it had recognized revenues from several customers prematurely because "[f]or certain customers from whom collection of payment could not be reasonably assured as of December 31, 2009, we will only recognize revenue on the date that such collection can be assured," (AC ¶ 74), and admitted it had prematurely recognized an additional $18 million revenue on transactions with "two customers" – a German customer and the Italian subsidiary of a U.S. customer and at the August 19, 2010 conference call, Qu and Chien refused to explain why CSI doubted these customers would pay or identify the purported "subsequent events" (AC ¶ 74) that rendered payment doubtful. (AC ¶ 87).

14

In addition, CSI admitted to its auditor's findings of "material weaknesses" found adequate just one year before when there was no stock offering: "[our] controls designed to ensure that all revenue recognition criteria were met prior to recognizing revenue did not operate effectively" and "appropriate control was not designed to ensure that estimated sales returns were recorded," (AC ¶¶ 55, 56), and that by end of 2009 it lacked "effective internal control over financial reporting."  (Id.).

## II.  Discussion

The standards to be applied under Rules 9(b) and 12(6) of the Federal Rules of Civil Procedure were set forth in the March 30 Opinion and remain applicable.

## A) The AC Fails to Adequately Allege a Materially False Statement

The Plaintiffs have alleged that statements made by CSI in October and November 2009 were false and misleading because CSI's 3Q 2009 financials included revenue from a "sham" sale to Sun Valley.  Specifically, Plaintiffs challenged (i) an

15

October 13, 2009 press release (AC ¶ 58); (ii) an October 14, 2009 Form 6-K (AC ¶ 60); (iii) an October 15, 2009 prospectus (AC ¶ 61); (iv) a November 17, 2009 press release (AC ¶ 63); and (v) a November 18, 2009 Form 6-K attaching the November 17, 2009 press release. (AC ¶ 64).

The Plaintiffs also have alleged that CSI intentionally failed to disclose internal control deficiencies in 3Q 2009 based on the assumption that the Sun Valley transaction was fraudulent and that an August 19, 2010 CSI disclosed that CSI had material weaknesses in internal controls as of December 31, 2009.

These allegations are identical to the allegations of the Initial Complaint, except that allegations with respect to four described CWs have been added.  As discussed below, the allegations continue to present pleading deficiencies identified in the March 30 Opinion and the AC is therefore dismissed.

### i) **The AC Does Not Allege A Materially False Statement As To The Sun Valley Transaction**

Plaintiffs have contended that CSI engaged in a number of alleged "sham" transactions in 3Q and 4Q 2009, and that "the

Sun Valley consignment is just one in a series of similar transactions for which CSI is alleged to have improperly recognized revenue." (Pl. Opp. at 13-14). No similar transactions, however, have been alleged and Plaintiffs have only identified the 3Q 2009 Sun Valley transaction as an example. (AC ¶¶ 38-60). Instead, Plaintiffs aver that there may "possibly be improper transactions with other unnamed customers, but have not alleged basic facts such as customer name, date and amount of the transactions or nature of the alleged impropriety about any such transactions. (AC (Ex. 13) at 35, 38; AC ¶¶ 58, 80). References to interactions with "unidentified customers," "a German customer," "the Italian subsidiary of a U.S. customer," and "certain customers" (AC ¶¶ 81, 86-87), fail to establish where fraudulent transactions in the absence of "specific facts about each one of these transactions are required." Janbay, 2012 WL 10803066, at *4. Speculation about unnamed transactions does not establish the materiality of the Sun Valley transaction. Rombach v. Chang, 355 F.3d 164, 170, 176 (2d Cir. 2004).

Plaintiffs have alleged the Sun Valley transaction was a consignment sale, based upon allegations made in the Sun Valley Complaint and statements by CWs, two of whom provide

17

summaries of purported notes of CSI meetings and emails from
late 2009.  (AC ¶¶ 33-38, 44-45).  To begin with, the Sun Valley
Complaint does not establish falsity.  The Plaintiffs have
suggested that because their counsel spoke with Sun Valley's
counsel, they may rely on Sun Valley's Complaint.  (Pl. Opp. at
7-8).  However, the March 30 Opinion specifically rejected the
allegations from the Sun Valley Complaint as insufficient,
concluding that it "cannot establish the particularized facts
necessary to support this securities fraud claim."  Janbay, 2012
WL 1080306, at *5; see also Caiafa v. Sea Containers Ltd., 525
F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (holding that "allegations
. . . contained in pleadings from an unrelated lawsuit [ ] are
inadmissible").  CSI recognized $5,764,430 in revenue on that
transaction, which represented 2.7% of CSI's 3Q 2009 revenue at
0.9% of its total 2009 revenue. (11/18/2009 Form 6-K (Ex. 10) at
6; 8/20/2010 Form 6-K (Ex. 2) at 6; AC ¶ 85).  The AC has
offered no new facts that would render disclosure of the
transaction material to the reasonable investor or even "place
the purported value of the Sun Valley sale within the context of
CSI's total financial picture."  Janbay, 2012 WL 1080306, at *6-
7 (citing authority).

The March 30 Opinion noted that the Sun Valley Complaint "does not identify any specific transaction and contains no inference that Sunvalley, CSI's customer knew when or how CSI accounted for its sales."). Id. at *7. Accordingly, the allegations in the Sun Valley Complaint fail to provide particularized facts sufficient to support a claim about the 3Q 2009 Sun Valley transaction or the manner in which that sale was recognized.

The Plaintiffs have attempted to supplement the AC to "provide the context of CSI's total financial picture." (Pl. Opp. at 11-15). However, "a party is not entitled to amend its complaint through statements made" in its "opposition memoranda to [a] motion to dismiss." Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998); Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011). The Plaintiffs' contention that the Sun Valley sale was material because it made up approximately 45% of CSI's 3Q 2009 revenue for the "America" region has been previously rejected. Janbay, 2012 WL 1080306, at *7 (finding that the "America" region constituted only a tiny portion of CSI's FY 2009 revenue and was "the Company's least significant and least productive geographic segment"). Although the Plaintiffs have suggested that the Sun Valley sale masked

19

negative "revenue trends" (Pl. Opp. at 13), with or without the Sun Valley revenue, CSI's net revenue nearly doubled between 2Q 2009 and 3Q 2009 (id. at 12), and its $213 million in 3Q 2009 revenue was less than the $252.4 million reported for 3Q 2008. (AC ¶ 63).

In addition, as to the confidential witnesses, the AC has failed to establish the basis of either CW1 or CW2's knowledge about the Sun Valley transaction. Neither CW1 nor CW2 are alleged to have had any first-hand knowledge or any aspect of the Sun Valley transaction. (AC ¶¶ 42-43). For example, CW1 stated that he was "cut out of the loop of management" and CW2 was not working at CSI when the Sun Valley transaction was recorded. (Id.).

Plaintiffs, however, have contended that the CWs are alleged to have been in a position to know the specifics of the Sun Valley sale, how it was recorded by CSI, and what the Defendants thought about it (Pl. Opp. at 10-12). They have suggested that, because they identify the "position and dates of employment" for CW1 and CW2, the information provided by those witnesses should be credited. (Id. at 3-4). CW1 and CW2, however, are alleged to have knowledge about a different

20

transaction with Regenesis but there are no allegations of any involvement with or knowledge of the terms or accounting treatment of the Sun Valley sale. (AC ¶¶ 42-43).  The only allegations in the AC involve CW1 purportedly hearing that some of the Regenesis product would be taken by Sun Valley, while CW2 was not even aware that Sun Valley had received any product in 3Q 2009.  Id.  CW1 is alleged to have stated that at some point "everyone was told by Zhuang that Sun Valley was 'going to take . . . all'" of the product originally meant for a customer named Regenesis (AC ¶ 42(b)), and CW2 is alleged to have stated that the Regenesis product was diverted to "another company." (AC ¶ 43(c)).  Neither allegation is adequate to establish a claim that the Sun Valley transaction was fraudulent or a "sham."

The allegations relating to CW3 and CW4 similarly fail to establish that either CW was in a position to know the information attributed to him or to her.  Courts have held that confidential witnesses must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novacks v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000).  Here, the AC provides no identifying information as

21

to the CWs.  (See e.g. AC ¶¶ 44, 45) ("CW3 does not want to be
identified"); ("CW4[ ] wishes to remain anonymous").

          Moreover, the information attributed to CW3 and CW4
was not first-hand information.  Instead, the AC has alleged
that CW3 gleaned information from "general conversation" (AC ¶
44(a)), other employees (AC ¶ 44(b)), and notes "read" to and by
CW3 (AC ¶¶ 44(d); 44(f)).  Such second-hand information,
obtained only through intermediaries, undermines "the likelihood
that he had personal knowledge of the allegations[.]"  Glaser,
772 F. Supp. 2d at 595.  Similarly, the emails summarized by CW4
are not alleged to have included CW4 at all.  (AC ¶¶ 45(a)-(n)).
CW3 is not alleged to have attended the November 23, 2009
meeting and could have obtained at most second-hand information
about the meeting.  See Campo v. Sears Holding Corp., 371 F.
App'x 212, 217 (2d Cir. 2010) (discounting allegations based on
a confidential witness who lacked personal knowledge of
Defendants' access to information about fraud); see also Janbay,
2012 WL 1080306, at *6 (noting that the complaint did not allege
any facts about a confidential witness or her basis of
information, then holding that "[s]uch lack of description is,
alone, fatal to CW4's allegations").  Plaintiffs do not identify
the source of their allegations regarding a purported November

22

23, 2009 meeting (AC ¶ 44(f), and those allegations are accordingly unreliable as a matter of law.

The excerpts of the 2009 meeting notes and emails from CW3 and CW4 are the same meetings and emails alleged in the Initial Complaint. (Compare AC ¶¶ 44-45 with Initial Complaint ¶¶ 63-65, 67). As previously concluded, these notes do not establish that the Sun Valley transaction was a "sham" sale or that revenue was improperly recognized. Janbay, 2012 WL 1080306, at *5. Indeed, no sales meeting attendee or email author is alleged to have first-hand knowledge of the negotiation, original terms of sale, or accounting treatment of the Sun Valley sale. Instead, the new email excerpts alleged in the AC merely disclose that CSI received clearance from its independent auditor when accounting for a sale that the Plaintiffs allege involved Sun Valley, and that CSI stored some product at a Sun Valley warehouse for which CSI paid a rental fee that was properly recorded as rental expense. (AC ¶¶ 45(i); 45(m)). These allegations are insufficient to demonstrate fraud. Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 116 (2d Cir. 19892); Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *13 (S.D.N.Y. Sept. 30, 2004); Caiafa, 525 F. Supp. 2d at 411 n.10.

23

**ii)   The AC Fails to Adequately Allege That the Statements Concerning Internal Controls Were False and Misleading**

The Plaintiffs have alleged that statements regarding CSI's 3Q 2009 results were "false and/or misleading" because CSI "failed to disclose . . . that the Company's internal and disclosure controls with respect to its revenue recognition policy were materially deficient[.]"  (AC ¶¶ 63-64).  However, as previously concluded, Plaintiffs have not "allege[d] any facts explaining why or how CSI's internal controls were materially deficient at the time CI made" the statements regarding the Company's 3Q 2009 results.  Janbay, 2012 WL 1080306, at *9; see also Fishbaum v. Liz Claiborne, Inc., 189 F.3d 460, 1999 WL 568023, at *3 (2d Cir. 1999) (requiring allegations establishing that "adverse circumstances existed and were known to the [Defendants] at the time the statements were made" in order to plead a false statement).

In addition, Plaintiffs have failed to allege that the controls were inadequate at the time the relevant statements were made.  The AC has alleged that after completing its 2009 audit of SCI in August 2010, the auditors concluded that the "Company [had] not maintained effective internal control over

24

financial reporting as of December 31, 2009." (AC ¶ 55). The allegation fails to establish that CSI's internal controls were inadequate in October and November 2009 when CSI made its statements regarding 3Q 2009 results. (AC ¶¶ 58-64).

The Plaintiffs have again not "plead specific facts explaining why each alleged misstatement was false at the time it was made," and their internal controls allegations accordingly fail. See Janbay, 2012 WL 1080306, at *4.

### iii) The AC Fails To Adequately Allege That The 4Q 2009 Release Was False And Misleading

The AC has alleged that CSI's March 3, 2010 press release, which announced the Company's unaudited 4Q 2009 and 2009 financial results, was false and misleading. Specifically, Plaintiffs allege that the press release included revenue "from the shipment of product for which revenue should not have been recognized," failed to disclose that the Company had "abandoned" its internal and disclosure controls, and issues financial statements that did not comply with Generally Accepted Accounting Principles ("GAAP"). (¶¶ 67-68). These allegations repeat those advanced by Plaintiffs in connection with

25

Defendants' disclosure of CSI's 3Q 2009 results based on the same facts and they fail as set forth above.

The AC has also referenced May 5, 2010 Form 6-K attaching a May 3, 2010 press release. (AC ¶ 69).  No May 5, 2010 Form 6-K, however, has been submitted.  To the extent that Plaintiffs meant to refer to a March 5, 2010 Form 6-K, their allegations related to the March 5 disclosure suffer from the same shortcomings as the March 3, 2010 press release.

CSI's August 19, 2010 press release announced revisions to 4Q 2009 net revenues and explained the basis for each adjustment.  (AC ¶ 74).  The Plaintiffs have suggested that CSI's revision of certain 4Q 2009 results demonstrates that there were "irregularities" with unidentified sales transactions from which revenue was incorrectly recognized, including in 3Q 2009.  However, the Plaintiffs have not alleged any particularized facts showing that the revisions were the result of improper sales to dispute that the revision of financials in one quarter does "not alone demonstrate fraud or falsity of statements in other periods."  Janbay, 2012 WL 1080306 at *9.

26

Moreover, none of the adjustments were related to the 3Q 2009 Sun Valley sale, and Plaintiffs have not alleged that any of the stated reasons for the revisions were untrue or grounded in fraud.  For example, even though the 4Q 2009 financial results reported in the March 3, 2010 press release and March 5, 2010 Form 6-K were later adjusted, that adjustment does not support the existence of a fraudulent scheme or the falsity of any prior statements.  Teamster Local 617 Pension & Welfare Funds v. Apollo Group, Inc., No. Civ. 06-02674-PHX-RCP, 2011 WL 1253250, at *23, *27 (D. Ariz. Mar. 31, 2011) (restatement insufficient to plead falsity where complaint lacked particularized facts drawing "a specific nexus" between restatement and alleged misstatements).

### B) The AC Fails To Adequately Allege Scienter

In order to plead securities fraud in accordance with the PSLRA, a plaintiff must allege with particularity facts giving rise to a "strong inference" that the defendant acted with "the required state of mind," 15 U.S.C. § 78u-4(b)(2), which includes the "intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976).  This inference of scienter "must

be more than merely plausible or reasonable - it must be cogent
and at least as compelling as any opposing inference of
nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights,
Ltd., 551 U.S. 308, 314 (2007).

        "To satisfy this requirement, a complaint must (1)
demonstrate 'that defendants had both motive and opportunity to
commit fraud,' or (2) allege 'facts that constitute strong
circumstantial evidence of conscious misbehavior or
recklessness.'" Campo, 635 F. Supp. 2d at 332-33 (citation
omitted).

        When evaluating scienter, culpable inferences must be
weighed against non-culpable ones as the complaint will be
dismissed if the latter are more cogent and compelling.
Tellabs, 551 U.S. at 323-24. As the Court previously concluded,
"the [Initial] Complaint itself provides for a nonculpable
inference: that CSI sold product to Sun Valley, but when Sun
Valley defaulted, CSI's sales team worked to move the product to
another customer." Janbay, 2012 WL 1080306, at *12. The AC, as
with the dismissed Initial Complaint, fails to allege facts
demonstrating "a concrete and personal benefit to the individual
defendants resulting from the fraud." Kalnit v. Eichler, 264

28

F.3d 131, 139 (2d Cir. 2001).  Plaintiffs have not alleged "that anyone at CSI, including the Individual Defendants, made any stock sales, let alone any suspicious sales, during the purported Class Period." Janbay, 2012 WL 1080306, at *10 (citing authority).

Instead, Plaintiffs have continued to allege that Defendants were motivated by CSI's desire to complete a secondary public offering.  (AC ¶ 48).  However, as the March 30 Opinion concluded, "efforts to complete a secondary public offering . . . do[ ] not entail concrete benefits sufficient to demonstrate motive." Janbay, 2012 WL 1080306, at *10 (citation and quotation omitted); see also In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money . . . is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit.").  That the proceeds of the offering might have been used to repay loans to Qu and other lenders does not change the outcome.  (See AC ¶ 27).  The "need to attract investors in order to pay down debt accruing . . . is insufficient to demonstrate scienter because it is common to most for-profit companies." Bd. Of Trustees of City of Ft. Lauderdale Gen. Employees Ret. Sys. v. Mechel OAO,

811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011); see also San Leandro
Emergency Medical Group Profit Sharing Plan v. Phillip Morris,
75 F.3d 801, 813-14 (2d Cir. 1996) (finding that the desire to
maintain a high bond or credit rating to maximize offering's
marketability does not establish motive).

        The allegations as to motive also refer to two analyst
reports.  These reports, one of which does not reference
Defendants, make observations about the solar technology
industry generally and offer no insight into Defendants'
motives.  At best, they provide "only generalized forecasting
and speculation," which courts have consistently rejected as
insufficient.  See Stern v. Leucadia Nat'l Corp., 844 F.2d 997,
1004 (2d Cir. 1988) ("It is not enough to quote press
speculation about defendants' motives . . . ."); Plumbers &
Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
Commerce, 694 F. Supp.2d 287, 300 (S.D.N.Y. 2010) ("Although a
plaintiff may use [news articles] in pleadings, the news
articles cited still must indicate particularized facts about a
defendant's conduct.") (citation and quotation omitted).

        Because the Plaintiffs have failed to adequately plead
any motive, "the strength of the circumstantial allegations of

30

conscious misbehavior or recklessness must be correspondingly greater." Janbay, 2012 WL 1080306, at *11.  As in the Initial Complaint, the Plaintiffs' claim of conscious misconduct is focused on the Sun Valley transaction and the statements made at two U.S. sales meetings and in a series of emails.  Id. at *11-13.  The AC continues to "tie[] none of the scienter allegations to any Individual Defendant."  Id. at *11.  There is no indication that any of the CWs or anyone else ever communicated the substance of these meetings or emails to the Individual Defendants.  See, e.g., Campo, 371 F. App'x at 217 (finding that scienter was not alleged where a confidential witness "had no knowledge of whether [the individual defendants] actually accessed or reviewed the reports."); In re Citigroup Inc. Sec. Litig., 735 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (holding "[f]atal to plaintiffs' claims[,]" a failure to allege that confidential witnesses presented information to individual defendants.).  Indeed, "Plaintiffs allege no direct contact between [the] CW[s] and Defendants," rendering their scienter allegations insufficient as a matter of law.  In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011).  See also In re Am. Express Co. Sec. Litig., No. 02 Civ. 5533(WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (discounting allegations where Plaintiffs "failed to allege any

facts showing that the confidential sources . . . had any contact with the Individual Defendants"); Local No. 38 IBEW Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (same).  The AC still "does not allege that the Individual Defendants knew information about the Sun Valley Sale that would render their statements false."  Janbay, 2012 WL 1080306, at *13.

        The Plaintiffs have suggested that scienter is sufficiently alleged because CSI was "run by a small control group of six executives in China," that there was a "close" relationship between Zhuang and Qu, that Qu purportedly retained "a tight rein" over CSI, and that therefore the Individual Defendants must have known about the purportedly fraudulent Sun Valley sale.  (Pl. Opp. at 19).  However, allegations that the Defendants must have known of fraud because of their positions in the company are insufficient as a matter of law.  In re PXRE Group, 600 F. Supp. 2d at 538 (rejecting allegation that "Defendants must have known" information known to another executive "due to their positions" and their "'intimate corporate culture'")

32

Plaintiffs also have contended that scienter may be inferred because "the $5.8 million phony Sun Valley sale represented nearly half of the revenues from CSI's sales in America" in 3Q 2009, and "Qu and Chien at least knew of CSI's pattern of wrongfully recognizing revenue from consignments and other transactions where collection was uncertain." (Pl. Opp. at 20). The size of a purportedly fraudulent transaction, however, is insufficient to support an inference that any Individual Defendant knew it was a "sham," and the AC fails to plead the existence of any other sham sales, let alone any defendant's knowledge of such transactions. See Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 219 (S.D.N.Y. 2009). The Plaintiffs argue that the size of CSI's revision of 4Q 2009 results supports a strong inference of scienter. (Pl. Opp. at 20-21). However, as already concluded, this revision cannot establish scienter given Plaintiffs' failure to show that it was "the product of fraudulent intent." Janbay, 2012 WL 1080306, at *10.

Additionally, the Plaintiffs' allegation, from CW3, that Zhou claimed that Qu "regretted dumping inventory on Sun Valley and won't do it again in the future" does not establish scienter because it "does not explain how or when Qu learned of

the information, is based upon a CW who allegedly heard yet
another person (Zhou) claim to read Qu's mind." Id. (See AC
¶ 44(d)(iv)).   There are no facts concerning "what king of
access [Zhou] had to [Qu], in what form and context [Qu] made
his alleged statement, or how [Zhou] was privy to that
statement." Janbay, 2012 WL 1080306, at *11.  Plaintiffs'
assertion that Zhou worked directly with two CSI executives,
neither of whom was Qu, and that only a small group of executive
officers, which again did not include Zhou, had access to Qu is
insufficient. (Pl. Opp. at 19-20).

          CW3's additional allegation that he or she recalled a
discussion in which Zhuang claimed that "Shawn wanted to clear
inventory" (AC ¶ 44(e)) similarly does not establish knowledge
of any impropriety, but suggests a desire to sell the Company's
product. See, e.g., Gavish, 2004 WL 2210269, at *19 (stating
that even aggressive sales practices "do not by themselves raise
a strong inference of scienter").  Plaintiffs allege no facts
concerning Chien's alleged state of mind and therefore fail to
plead scienter as to Chien as a matter of law. See, e.g.,
Fezzani v. Bear, Stearns & Co., Inc., 384 F. Supp.2d 618, 643
(S.D.N.Y. 2004) (dismissing individual defendants because "there

34

are no allegations as to how each Individual Defendant acted with scienter").

The suggestion that Qu must have known that the revenue from the Sun Valley transaction was improperly recognized because he exercised "tight control" over U.S. operations is similarly inadequate.  (AC ¶ 43(a)).  The allegation stems from CW1 and CW2, neither of whom is alleged to have ever interacted with Qu or to have any knowledge about how revenue from the Sun Valley transaction was recognized.  See Local No. 38, 724 F. Supp. 2d at 460 (discounting confidential sources who "had no contact with the Individual Defendants"); Glaser, 772 F. Supp. 2d at 590 (finding a confidential witness' allegations "insufficient absent some allegation that the witness communicated with the individual defendants").  CW1 "was cut out of the loop of management" and admitted that he "was not sure if [the search for other customers for the Regenesis product was] for Q3 or Q4." (AC ¶ 42(b)).  Additionally, CW2 "left before the Regenesis product was sent to Sun Valley[]" (AC ¶ 43(d)) and thus had no personal knowledge of how and when the Sun Valley transaction occurred or how it was recognized.

As to the Sun Valley Complaint, Plaintiffs also aver that they have pled CSI's corporate scienter because their confidential witnesses' allegations and the Sun Valley Complaint show that Zhuang knew that the "Sun Valley transaction was [a] consignment, not a final sale" and thus could not be recognized in 3Q 2009. (Pl. Opp. at 16-17). However, as set forth above, the CWs cannot support a claim regarding Zhuang, or any other CSI executive.

Moreover, the March 30 Opinion concluded that the Sun Valley Complaint does not contain particularized facts demonstrating that anyone at CSI knew of any alleged fraud. Plaintiffs' counsel's conversation with Sun Valley's attorney (AC ¶ 38) does not constitute particularized facts and there is no allegation that anyone at Sun Valley ever interacted with either of the Individual Defendants. See, e.g., Glaser, 772 F. Supp. 2d at 594 (discounting confidential witness' allegations where he were not employed with defendant company or alleged to have any contact with individual defendants); Campo, 635 F. Supp.2d at 335 (fining scienter not alleged based on confidential witness' allegations since "none had any contact with either [defendant]"). The Sun Valley allegations about CSI's revenue recognition were themselves based upon information

36

and belief and not personal knowledge. (AC ¶ 37).  See

Dealtime.com v. McNulty, 123 F. Supp. 2d 750, 761 (S.D.N.Y.

2000) (allegation based on information and belief "does not meet

the strict pleading requirements of the Reform Act, which

requires that a plaintiff 'state with particularity all facts on

which that belief is formed.'") (citation omitted).  As

previously concluded, "[t]he Sun Valley Complaint does not

identify any specific transaction," nor do Plaintiffs explain

how Sun Valley, as "CSI's customer, knew when or how CSI

accounted for its sales."  Janbay, 2012 WL 1080306, at *7.


     The Plaintiffs also contend that scienter is

demonstrated "by [the] sudden and severe material change in

Defendants' willingness to maintain and follow internal control

over revenue recognition." (AC ¶ 52).  Plaintiffs have alleged

no particularized facts demonstrating that Defendants knew or

had reason to know that the Company's internal controls were not

operating effectively.  To the extent that Plaintiffs have

alleged that the disclosure of inadequate internal controls is

itself indicative of scienter, courts have consistently rejected

such allegations as insufficient. See, e.g., Novak v. Kasaks,

216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations of GAAP

violations or accounting irregularities, standing alone, are

37

insufficient to state a securities fraud claim."); Coronel v. Quanta Capital Holdings Ltd., No. 07 Civ. 1405(RPP), 2009 WL 174656, at *29 (S.D.N.Y. Jan. 26, 2009) (finding disclosure of internal control problems did not demonstrate "that the Company knowingly withheld the true financial results" earlier that year).

Lastly, the cases cited by Plaintiffs involved specific allegations establishing scienter that are not alleged in the AC. See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76-77 (2d Cir. 2001) (finding scienter where complaint contained "detailed allegations as to what defendants knew on a daily, weekly and monthly basis . . . while at the same time making public statements that painted a different picture"); Rothman v. Gregor, 220 F.3d 81, 90-91 (2d Cir. 2000) (finding that plaintiffs successfully alleged that defendants had knowledge that their accounting for royalties was improper); In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (holding scienter pled where, in addition to $281.4 million restatement, plaintiffs alleged facts showing that defendants had knowledge that certain statements were false when made). Taken together, Plaintiffs have failed to adequately allege scienter.

38

## III.  **The AC Fails To Adequately Allege Loss Causation**

The Initial Complaint was dismissed because it failed to plead loss causation, "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d at 172; Janbay, 2012 WL 1080306, at *14-16.  In order to establish loss causation, Plaintiffs must "allege facts sufficient to show that the 'relevant truth' that had been concealed by Defendants' purportedly false statements was disclosed to the market, which in turn caused CSI's stock price to decline." Id. at *14 (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342-43, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)).

Plaintiffs have alleged that the truth regarding the allegedly false statements was revealed by two "partial disclosures."  The June 1, 2010 press release announced a delay in the release of CSI's 1Q 2010 financials, the SEC subpoena, the Company's internal investigation, and the possibility that CSI may revise its 4Q 2009 net revenue, but contained no statement about the Sun Valley transaction, the existence (or possible existence) of sham sales transactions, or deficient

39

internal controls. (6/1/2010 Press Release (Ex. 11) at 5-8; AC ¶¶ 71, 96). Plaintiffs contend that the June 1 press release applied to periods other than 4Q 2009, (AC ¶ 96 (alleging that the June 1, 2010 press release disclosed that CSI "might" need to revise reported "full year net revenues for 2009 (which includes all quarters prior to Q4)")), but the language indicates that any revision would be limited to 4Q 2009. (AC ¶ 71; 6/1/2010 CSI Press Release (Ex. 11) at 5).

The March 30 Opinion also concluded that nothing in this press release established loss causation. Janbay, 2012 WL 1080306, at *15. Specifically, that the announcement that the 1Q 2010 financials would be delayed "fails to reveal the truth that CSI had engaged in sham sales, secret consignments, or any wrongdoing asserted" in the AC. Janbay, 2012 WL 1080306, at *15 (citing authority); see also In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (finding disclosure that company "would not be able to file its 10-Q for the third quarter of 2006 on time due to the Special Committee's investigation" not corrective).

Likewise, the disclosure of the SEC subpoena and internal investigation fail to "link the subpoena or

40

investigation to the actual fraudulent conduct alleged in the complaint." Janbay, 2012 WL 1080306, at *15. The June 1 press release merely announced that the SEC "had issued a subpoena 'requesting documents from the Company relating to, among other things, certain sales transactions in 2009.'" (AC ¶ 96; Pl. Opp. at 23). The press release's statement that CSI "may" revise net revenue for 4Q 2009 makes no mention of purported sham transactions or deficient internal controls, and thus could not have revealed any "truth" regarding Defendants' purported fraud. See id. at *15-16 (finding that CSI's June 1, 2010 announcement of "the possibility that it may revise its 4Q 2009 net revenue" did not establish loss causation) (citing authority). It did not reveal that CSI had supposedly engaged in any fraudulent activity, disclose that any CSI accounting was in question, or even identify the reasons for the request. The announcement therefore cannot constitute a corrective disclosure or establish loss causation. Janbay, 2012 WL 1080306, at *15-16 (holding that June 1, 2010 CSI press release failed to plead loss causation).

The AC also alleges that the Sun Valley sale was recognized in 3Q 2009 (AC ¶ 85), not the 4Q 2009 period covered by the June 1, 2010 CSI press release. The lack of any

41

references to that sale or to CSI's 3Q 2009 financials in the June 1 press release demonstrates Plaintiffs' failure to plead loss causation. See Janbay, 2012 WL 1080306, at *16.

Like the Initial Complaint, the AC also relies on the June 2, 2010 TheStreet.com article. (compare Initial Complaint ¶ 70 with AC ¶ 72). This article, which was "admittedly 'speculating' about why some CSI customers were returning goods" does not establish loss causation. Janbay, 2012 WL 1080306, at *16. "[Q]uestions and speculation by analysts and commentators do[] not reveal any 'truth' about an alleged fraud as required." Id. The analyst speculation here was unrelated to the improper conduct alleged in the AC, (see AC ¶ 72 ("speculating" that return of CSI goods could be linked to "a quality control problem," "double ordering by customers," or "certain customers going out of business"), and it could not have proximately caused any loss. As the March 30 Opinion stated "the June 2 TheStreet.com article did not correspond with a drop in CSI's stock price." Id.; (Chart of CSI Stock Prices (Ex. 4) at 1). "Without a corresponding stock price decline, an announcement cannot establish loss causation." Janbay, 2012 WL 1080306, at *16.

## IV.   **The AC Fails To Adequately Allege Section 20(a) Liability**

In order to plead a § 20(a) claim, "a complaint must allege (1) a primary violation of the [Exchange] Act by a controlled person, (2) direct or indirect control by the defendant of the primary violator, and (3) 'culpable participation.'" Janbay, 2012 WL 1080306, at *17 (citations and quotations omitted). As set forth above, Plaintiffs have failed to plead a primary violation of § 10(b). Additionally, for the reasons discussed with respect to scienter, Plaintiffs have not alleged the "culpable participation" of Defendants in any purported fraud. Accordingly, Plaintiffs' § 20(a) claim is dismissed. See Janbay, 2012 WL 1080306, at *17.

## V. **Conclusion**

For the reasons stated above, Defendants' motion is granted and the AC is dismissed with prejudice.

It is so ordered.

**New York, NY**
**March 2 7 , 2013**

43

_____
ROBERT W. SWEET
U.S.D.J.